LINDEN MOTOR FREIGHT CO., INC., A CORPORATION OF
THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v. THE TRAVELERS INSURANCE COMPANY, DEFEND-
ANT-RESPONDENT.

Argued December 3, 1962—Decided July 5, 1963.

512

Mr. *Joseph A. Weisman* argued the cause for plaintiff-appellant (*Messrs. Hannoch, Weisman, Myers, Stern & Besser*, attorneys; *Mr. Weisman* and *Mr. Geoffrey Gaulkin*, of counsel; *Mr. Gaulkin* on the brief).

Mr. *William L. Dill, Jr.*, argued the cause for defendant-respondent (*Messrs. Stryker, Tams & Dill*, attorneys; *Mr. Dill*, of counsel).

The opinion of the court was delivered by

HALL, J. The issue here is the plaguing one of the meaning of language frequently used in personal insurance policies conditioning the payment of certain benefits upon the sustainment of "bodily injuries effected directly and independently of all other causes through external, violent and accidental means." The contract issued by the defendant was one of insurance upon the life of Edward Salz, an employee of the plaintiff, in which the employer, a trucking concern, was designated as beneficiary. It provided for payment of double the $10,000 face amount in the event death resulted from bodily injuries occasioned in the manner specified by the quoted words.

The factual setting was that of death from a coronary thrombosis, and consequent myocardial infarction, established by autopsy, which was found to have been causally related to the act of picking up some fallen cartons in plaintiff's warehouse. Defendant paid the face amount of the policy

but contended the circumstances were such as to render the double indemnity provision inoperative. This suit seeks recovery of that additional amount. The case was tried in the Law Division without a jury and the court held for the insurer. We certified plaintiff's appeal on application while it was pending in the Appellate Division. *R. R.* 1:10–1A.

There was no dispute as to the facts of the triggering incident. They were testified to by the only eyewitness, Frank Toth, plaintiff's general manager. He and Mr. Salz went to the concern's place of business on the Saturday morning in question, a non-work day for other employees, to prepare for Monday's work. This was in accordance with their usual custom. Mr. Salz was the company's dispatcher; his duties were mainly clerical and ordinarily did not involve physical effort. After attending to some office work, the two went into the warehouse for a routine inspection tour. What transpired is best described by the exact findings of the trial judge:

"* * * they noticed that a wooden pallet containing cartons of Prestone was out of place and projecting into the aisle in violation of the fire law requirements to keep the merchandise within the lines. The decedent and Toth decided that it should be lined up correctly so as to leave the aisle clear. Toth procured a lift-truck and maneuvered it so as to lift the pallet containing the cartons of Prestone in order to align it properly. After raising the pallet, the lift-truck stalled, jerked and the cartons of Prestone leaned forward and some fell on the floor. Mr. Toth testified that the decedent, Salz, started laughing and hurried over to the fallen cartons. He further testified that they started placing the cartons upright at once, that they hurried to do so because with the cartons upside down, there might be spillage and several cartons might be damaged; that while they were picking up the cartons, the decedent started coughing 'like gasping for breath' and turned white and walked out of the warehouse."

Each carton weighed about 63 pounds and Mr. Salz had picked up seven or eight before the coughing spell. None of the cartons touched him in the course of their fall, he did not instinctively grab for any of them as they fell, nor was

there any evidence that, physically, something unforeseen or involuntary occurred in his movements in picking them up.

Mr. Salz rested on a settee in the office for a time and then drove home, where he lay on a sofa for several hours. He felt much better by late afternoon and subsequently went with his wife to spend the evening at a family gathering. While engaged in a friendly card game there, he complained of distress and collapsed. He was removed to the hospital and died some 16 days later. The medical testimony was in conflict concerning the relation of the coronary thrombosis to the incident in the warehouse. The trial judge found causal connection as a fact and defendant does not contest that conclusion.

The ultimate issue in the case—whether death had resulted from bodily injury (the thrombosis and infarction) effected through accidental means—was a mixed question of law and fact. As the underlying basis for deciding it, the court relied upon the oftquoted interpretation of identical policy language expounded in the leading case of *United States Mutual Accident Association v. Barry*, 131 *U. S.* 100, 9 *S. Ct.* 755, 33 *L. Ed.* 60 (1889):

"'* * * that the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means." (33 *L. Ed.*, at *p.* 67)

The trial court held that New Jersey followed the *Barry* thesis of policy meaning as distinct from the view taken in some jurisdictions equating "accidental means" with "accidental result" and found factually that the act of picking up the fallen cartons was voluntary and intentional and "had nothing unforeseen, unusual or unexpected, other than the

resultant injury." The legal conclusion therefore was that the heart injury was not effected by accidental means.[1]

Plaintiff's main contention on this appeal consists of a frontal attack on the interpretation laid down by *Barry*. It specifically seeks a holding that "accidental results of voluntarily undertaken acts qualify as accidental means." The argument is that the course of prior New Jersey cases has now actually come to that conclusion, though paying lip service to the viewpoint of *Barry*, or that, regardless of prior law in this State, the time has arrived for us to espouse the "accidental result" interpretation openly.

Before dealing with the latter theory, a clear understanding should be had of the thought intended to be conveyed by the quotation from *Barry*. The insured there was a physician who had gone with two other doctors to visit a patient living in a house behind a drug store. The visit concluded, the three wished to go into the store by a rear entrance, which was most quickly reached by jumping from a platform upon which the door of the house opened. The distance from the platform to the ground was between four and five feet. The other physicians jumped first and alighted without mishap. The insured landed heavily, apparently on his heels. He soon

---

[1] The policy also excluded double indemnity benefits if death resulted from "disease of any kind, directly or indirectly." Defendant's medical evidence sought to show that the thrombosis resulted, at least in part, from pre-existing degenerative arteriosclerosis. The pathologist who performed the autopsy testified that the signs of that disease were not excessive for a man of decedent's 51 years. The trial court did not reach the question of the application of the quoted policy provision and we are not called upon to consider it either. Nor are we concerned with the further provision limiting coverage to death resulting from bodily injuries effected through accidental means "directly and independently of all other causes." As to the construction and application of such clauses, see *Kievit v. Loyal Protective Life Insurance Co.*, 34 *N. J.* 475 (1961) ; *Tomaiuoli v. United States Fidelity and Guaranty Co.*, 75 *N. J. Super.* 192 (*App. Div.* 1962) ; *Mahon v. American Casualty Co. of Reading*, 65 *N. J. Super.* 148 (*App. Div.* 1961), certif. denied 34 *N. J.* 472 (1961). The question whether the means here was "external" and "violent" as well as "accidental" was not argued.

became ill and died a few days later, allegedly from a stricture of the duodenum caused by the manner of his landing from the jump. There was evidence from which the jury might have inferred that he had alighted in a manner not intended, causing a jar or shock of unexpected severity.

The beneficiary's suit on a policy of accident insurance was tried before a jury in the federal court under its diversity jurisdiction in the days when so-called federal common law was in force. In addition to the sharply disputed questions of whether any injury was sustained from the jump and whether such proximately caused death, there was submitted for jury determination, if findings on the other questions were affirmative, the matter of whether the injury was effected "through external, violent and accidental means." This submission was on the basis of an instruction legally interpreting the policy clause as summarized in the quotation above and posing the factual issue arising therefrom in this language:

"And I instruct you that if Dr. Barry jumped from the platform and alighted on the ground in the way he intended to do, and nothing unforeseen, unexpected, or involuntary occurred, changing or affecting the downward movement of his body as he expected, or would naturally expect, such a movement to be made, or causing him to strike the ground in any different way or position from that which he anticipated or would naturally anticipate, then any resulting injury was not effected through any accidental means. [But if, in jumping or alighting on the ground, there occurred, from any cause, any unforeseen or involuntary movement, turn, or strain of the body, which brought about the alleged injury, or if there occurred any unforeseen circumstance which interfered with or changed such a downward movement as he expected to make, or as it would be natural to expect, under such circumstances, and as caused him to alight on the ground in a different position or way from that which he intended or expected, and injury thereby resulted, then the injury would be attributable to accidental means.]" (9 *S. Ct.*, at *p.* 759, 33 *L. Ed.*, at *p.* 64)

The jury returned a general verdict for the plaintiff and the judgment was affirmed by the United States Supreme Court. It approved the trial judge's instructions and concluded the jury could find from all the evidence that something occurred "accidental, unforeseen, involuntary, unex-

pected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground. &ast; &ast; &ast;"
9 *S. Ct.*, at *p.* 759, 33 *L. Ed.*, at *p.* 67.

The judicial writing most often referred to as articulating the "accidental result" theory of interpretation—and plaintiff bottoms its argument upon it—is the dissenting opinion of Justice Cardozo in *Landress v. Phoenix Mutual Life Insurance Co.*, 291 *U. S.* 491, 54 *S. Ct.* 461, 78 *L. Ed.* 934 (1934). This was also a federal common law diversity suit upon insurance contracts containing benefit provisions practically identical with that before us. Neither *Landress* nor *Barry* is, of course, binding upon state courts or, for that matter, on federal courts since *Erie Railroad Co. v. Tompkins*, 304 *U. S.* 64, 58 *S. Ct.* 817, 82 *L. Ed.* 1188, (1938), but the opinions in the two cases have served throughout the years as influential and convenient foundations for any viewpoint a court determines to apply to a particular case in this difficult and conflicting field.

*Landress* arose on the sufficiency of the complaint, which alleged, in effect, that the insured was playing golf on an ordinary summer day, a customary activity, and that he was suddenly and unexpectedly overcome by the force of the sun's rays, from which he shortly died. The Supreme Court affirmed the dismissal of the complaint on demurrer because it did not allege death resulting from bodily injuries effected through accidental means.

The opinion of Chief Justice Stone, speaking for eight Justices, relied upon the approach of *Barry*. The plaintiff had argued that the result had been accidental in the common or popular sense of the term, even though transpiring from voluntary exposure, and should therefore be within the policy coverage as effected through accidental means. The court replied:

"But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure 'was something unforeseen, unsuspected, extraordinary, an unlooked for mishap, and so an

accident,' * * *—for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental." (291 *U. S.*, at *pp.* 495–496, 54 *S. Ct.*, at *p.* 462, 78 *L. Ed.*, at *p.* 936)

The court tacitly recognized, however, both the difficulties which arise from the application of any rigid rule to the infinite variety of factual situations which present themselves in accident insurance cases and the common judicial technique of categorizing those situations for decision—a practice to which we shall advert later on—by going on to say:

"We do not intimate that injuries resulting from as inpalpable a cause as the inadvertent introduction into the body of noxious germs may not be deemed to be effected by external accidental means. * * * Nor do we say that in other circumstances an unforeseen and hence accidental result may not give rise to the inference that the external means was also accidental."

(In support of the first statement, the court cited *Western Commercial Travelers' Ass'n v. Smith*, 85 *F.* 401, 40 *L. R. A.* 653 (8 *Cir.* 1898), hereafter further referred to.) But it could find no such inference in a voluntary exposure to the sun's rays "with no indication that some unforseen or unintended condition or combination of circumstances, external to the state of the victim's body, contributed to the accidental result." 291 *U. S.*, at *pp.* 496–497, 54 *S. Ct.*, at *p.* 462, 78 *L. Ed.*, at *pp.* 936–937. This conclusion was buttressed by the court's canvass of the authorities which were said generally to hold that sunstroke resulting from voluntary exposure was not effected by accidental means.

Justice Cardozo in his dissent stated that he would test coverage, not by consideration of the means producing the result, but by viewing the result, which, if accidental, would automatically impart that quality to the cause. In developing this viewpoint, he first suggested that an attempted distinction between accidental means and accidental result was quite impossible—it "will plunge this branch of the law into

a Serbonian Bog." He then proceeded to lay down the broad criterion that the meaning of policy language be that attributed to it by the average man who takes out a contract of accident insurance. "It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company. * * * The proposed distinction will not survive the application of that test." Therefore he said, "[w]hen a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means. * * * If there was no accident in the means, there was none in the result, for the two were inseparable. * * * There was an accident throughout, or there was no accident at all." 291 *U. S.*, at *pp.* 499, 501, 54 *S. Ct.*, at *p.* 464, 78 *L. Ed.*, at *pp.* 938, 939. This loose test would appear to be almost subjective. At the least it would permit effective disregard of the policy language pointed out by the majority.

The seeming breadth of this criterion was somewhat narrowed later in the dissent, but the basic theory that the nature of the result controls the characterization of the means remained. The subsequent refinement would find an effect accidental, apparently as a matter of law according to the view of the court, if it was not the natural or probable consequence of the means which produced (which we will hereafter generally refer to as "the natural consequence theory"), *i. e.*, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect unintended by the actor, as distinct from a result which is the consequence of actual design or one which must be held to be the natural and probable consequence of the actor's deeds.[2] By and large, it has been this latter thesis

---

[2] This natural and probable consequence theory was not new with the Cardozo dissent. He expressly adopted language in *Western Commercial Travelers' Ass'n v. Smith, supra*, 85 *F.* 401, 40 *L. R. A.* 653, which had been quoted and applied many times before. In that case, an abrasion of the skin of the foot caused by the rubbing of

for which the Cardozo dissent has stood and which has formed the basis of approach by many courts. Indeed, practically every jurisdiction has used it at one time or another to decide some categories of factual situations.

Applying his proposed approach, Justice Cardozo felt that the average policyholder would think sunstroke an accident, and he cited an English workmen's compensation case in support. He further expressed the view that such a result from voluntary exposure to ordinary heat under not unusual circumstances was a nonnatural consequence and thus within the insurance coverage. Reference was made to an annotated collection of cases which commented, contrary to the conclusion of Chief Justice Stone, that the weight of authority so held.

We, of course, have a particular case to decide, in a special factual setting not previously passed upon by the highest court of this State. It cannot properly be resolved, without seeing where the problem fits in the mainstream of accident insurance law within and without New Jersey, both generally and with specific reference to that type of situation in which, as here, the producing act is voluntary, intentional, and without unexpected attributes but where the result is nevertheless unforeseen and unusual. The opinions in *Landress* were

---

new shoes resulted in fatal blood poisoning. Recovery was allowed on the ground that the abrasion was not the natural, probable or intended consequence of wearing *new* shoes. The latter act was found to be the accidental means. It is at least interesting to note that, despite the language Justice Cardozo utilized, the *Smith* court commented that sunstroke would not be within the policy coverage and, more significantly, held itself governed by *Barry*, quoting the very language we have previously set forth herein: "that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs, which produces the injury, then the injury has resulted through accidental means." Justice Cardozo first expressed the average policyholder criterion and the consequence rationale in a different factual setting and in less broad language when he was a member of the New York Court of Appeals. See *Lewis v. Ocean Accident & Guarantee Corp.*, 224 *N. Y.* 18, 120 *N. E.* 56, 7 *A. L. R.* 1129 (*Ct. App.* 1918). It may be noted that he there cited *Barry* as well as *Smith* as authority.

referred to at length because they exemplify the two principal approaches or tests, one of which, generally speaking, practically every court has utilized in deciding a particular case or category of cases one way or the other where the policy language included "accidental means." But rarely has either approach been uniformly applied to all factual categories in a single jurisdiction, including New Jersey; the outcome of cases which one might think factually analogous, as well as the legal reasoning used to support the conclusion, varies not only from state to state but within a state. See, *e. g.*, Note, "'Accident' and 'Accidental Means' in Indiana," 36 *Ind. L. J.* 376 (1961).; Comment, "The Judicial Approach to 'Accidental Means' Policies in California," 13 *Hastings L. J.* 255 (1961). It is safe to say, as our review of the *Landress* opinions intimated, that this conflicting field does not fall into a consistent and uniform pattern of analysis determined by the application of all-inclusive black and white rules. Very much seems to depend upon a court's unexpressed feeling of the fair and reasonable result in the particular factual setting, with made-to-order criteria and language then being used to bring about legal conformance to the conclusion previously reached. It has even been suggested that what courts actually do in an insurance situation is to approach it from a relational viewpoint, as is done in cases of principal and agent, master and servant, husband and wife, guardian and ward, where the law imposes responsibilities and duties outside any contract. Hancock and Grahame, "Are the Courts Destroying the Double Indemnity and Accidental Death Benefit?," 1951 *Ins. L. J.* 440.

The reason for this kind of judicial treatment is not hard to discover. Experience has demonstrated that there is just no single formula which can be articulated in words in order to propound automatically a fair and proper solution for every factual situation. The broad words "accident" and "accidental"—in their common and popular sense of something unforeseen, unexpected, unusual, which everyone agrees is the sense in which their use in accident insurance con-

tracts must be interpreted—necessarily encompass many varied types of happenings and what they should or should not include in an insurance policy largely depends on the viewpoint of the person whose judgment is to govern.

Justice Cardozo's primary test—the average policyholder's reading of the policy so that whatever this hypothetical individual speaks of as an accident *ipso facto* must bring insurance benefits—takes no account whatever of contract language, as we have previously said. The outcome has to be the same whether the key words of the contract are "accidental bodily injuries"—now used in some accident insurance policies, see *Tomaiuoli v. United States Fidelity and Guaranty Co.*, 75 *N. J. Super.* 192, 194 (*App. Div.* 1962), where Cardozo's criterion is perhaps more fitting—or the obviously narrower terminology, see 2 *Richards, Insurance* § 215, *p.* 730 (*5th ed.* 1952), of "bodily injuries effected  *  *  *  through  *  *  * accidental means," found in many such contracts and in practically all double indemnity provisions of life insurance policies as in the case at bar.

The "accidental means" language is rendered equally sterile under the natural and probable consequence articulation. The nature of the result, objectively assessed, is still the determining factor regardless of the policy language and again the policy is made to read as if the words used were "accidental bodily injuries."

Such indiscriminate approaches lead, in effect, to the same standard of recovery under a private insurance contract, no matter how it is worded, as prevails in this State with respect to benefits under the workmen's compensation law. That statute is keyed to "personal injuries  *  *  *  by accident," *R. S.* 34:15–7, *N. J. S. A.*, which criterion we deem to be satisfied " 'either if the cause was of an accidental character or if the effect was the unexpected result of routine performance of the claimant's duties.' " *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N. J.* 127, 139 (1958).

But private accident insurance is not legislatively directed to serve the beneficent social purpose of workmen's

compensation and cannot fairly be construed as if in parity. In addition, the premium charged, based upon experience and the insurer's view of its undertaking, is small. For example, the double indemnity clause in a life policy is usually provided at a premium rate graded by age and ranging from approximately $1 to $2 per $1,000 of insurance, Kelly, "Recent Developments in Double Indemnity Law," 33 *Cornell L. Q.* 360 (1948), which is fixed at the inception of the contract and remains unchanged throughout the life of the insured. As the Appellate Division pointed out in *Tomaiuoli, supra,* the fact of a small premium should play a part in the average insured's conception of the scope of coverage. See 75 *N. J. Super.*, at *p.* 206.

We do not see how, under any fair standard of construction, deliberate qualifying language in an insurance contract, such as "bodily injuries effected * * * through * * * accidental means," may be completely disregarded by a court, as plaintiff would have us do.[3]

██ The construction of insurance policy language is not ordinarily controlled by the standards applicable to a contract negotiated at arms length between two parties on the same plane. Since the form of the agreement and the language used are prepared by the insurer in advance and the coverage generally must be purchased by the insured in that form without change, it is unrealistic to talk about the

---

[3] The Commissioner of Banking and Insurance has ample power to resolve in advance many of the problems with which our courts have to wrestle in this type of case. By *N. J. S. A.* 17:38-1, every health and accident insurance policy, endorsement and application form must be filed with him before it may be issued or used with respect to a resident of this State. He is authorized to forbid use of the same by disapproval if, *inter alia,* provisions are contained which are unjust, unfair, inequitable, misleading or contrary to public policy or the contract is sold or solicited in such manner as to mislead the insured. See also *N. J. S. A.* 17:38-20, 17:35-26, 17:35-28 and, as to accidental death provisions of life insurance policies, *N. J. S. A.* 17:34-18, 19 and 20.

mutual intention of the parties. By the same token it seems idle to dwell at any length upon the semantical approach. So, beyond the universal rule that ambiguities and uncertainties are to be resolved against the company, many courts, including our own, have looked at policies from what we conceive to be the reasonable expectations of the average purchaser in the light of the contract language.

Thus, in *Kievit v. Loyal Protective Life Insurance Co.*, 34 *N. J.* 475 (1961), relied on by plaintiff, where we were concerned with the meaning and scope of clauses in an accident policy restricting coverage to losses "resulting *directly and independently of all other causes* from accidental bodily injuries" and excluding loss *"resulting from or contributed to by any disease or ailment"* (emphasis supplied), Justice Jacobs laid down the standard in this language:

"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.' * * * Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective." (34 *N. J.*, at *pp.* 482–483)

See also, *Tomaiuoli v. United States Fidelity and Guaranty Co., supra*, 75 *N. J. Super.*, at *pp.* 200–201; *Mahon v. American Casualty Co. of Reading*, 65 *N. J. Super.* 148, 165–166 (*App. Div.* 1961), certif. denied 34 *N. J.* 472 (1961). But we have been equally insistent that clear basic terms and particular provisions of an insurance contract may not be disregarded at will and a new contract judicially made for the parties. *Kampf v. Franklin Life Insurance Co.*, 33 *N. J.* 36, 43 (1960); *Tomaiuoli, supra*, 75 *N. J. Super.*, at *p.* 201.

We, like Chief Justice Stone in *Landress*, are not at liberty to disregard completely the accidental means provision of this policy and to say as an automatic proposition that an

accidental result requires the conclusion that the means was accidental. *Kievit* was not intended to undergird any such position. In ascribing a reasonable interpretation to the terms of the policy here involved, it is, to us, beyond question that "means" has reference to "cause," and that the double indemnity benefits of this policy should be available only where there is something accidental, in the common and popular sense, in the cause of the resulting injury, *i. e.*, in the events preceding and leading up to it. The insurer has specified, and we think the average policyholder would fairly appreciate, that the insurance is not against every death which might be thought accidental because unforeseen, unexpected or unusual in the circumstances, but only covers those situations where there was something of like quality which happened during the preceding events and brought about or contributed to the result.

There is room, of course, for great difference of opinion among courts, standing in the shoes of the average policyholder, as to what may reasonably be said to amount to something unforeseen, unusual or unexpected in the preceding event, thus bringing about very divergent judicial results. This is particularly so in the broad category of situations where the preceding act was voluntary and intentional on the part of the insured or occurred with his permission. Many of the conflicting judicial conclusions, both among states and within a single state between the results reached in analogous situations, are explainable on this basis, irrespective of the rationales actually expressed in support of them.

If we look particularly at the decisions in other jurisdictions which have dealt with the precise problem before us— the performance of voluntary, intentional, physical acts, without anything unexpected or unforeseen occurring during the course thereof which result in heart injury by reason of strain or overexertion—we find that the vast majority deny coverage as a matter of law, no. accidental means being

found.[4] In general, see Annotation, "Heart Attack Following Exertion Or Exercise As Within Terms of Accident Provision of Insurance Policy," 56 *A. L. R. 2d* 800 (1957).

Federal—*Prudential Insurance Co. v. Beckwith*, 67 *App. D. C.* 209, 91 *F. 2d* 240 (*D. C. Cir.* 1937) (plumber carrying bathtubs up and down stairs; this heavy work usually performed by others); *Carswell v. Railway Mail Ass'n*, 8 *F. 2d* 612 (5 *Cir.* 1925) (cranking auto in usual way); *Shanberg v. Fidelity & Casualty Co.*, 158 *F.* 1, 19 *L. R. A.*, *N. S.*, 1206 (8 *Cir.* 1907) (carrying 86 pound door).

California—*Rock v. Travelers' Insurance Co.*, 172 *Cal.* 462, 156 *P.* 1029, *L. R. A.* 1916 *E*, 1196 (*Sup. Ct.* 1916) (carrying coffin downstairs).

Indiana—*Schmid v. Indiana Travelers' Accident Ass'n*, 42 *Ind. App.* 483, 85 *N. E.* 1032 (*App. Ct.* 1908) (carrying heavy valises up hotel steps in high altitude).

Kansas—*Miller v. Prudential Insurance Co.*, 183 *Kan.* 667, 331 *P. 2d* 310 (*Sup. Ct.* 1958) (experienced oil field worker pulling drill pipe from well and carrying cement to plug hole).

Kentucky—*Mutual Benefit Health & Acc. Ass'n v. Blanton*, 306 *Ky.* 16, 206 *S. W. 2d* 70 (*Ct. App.* 1947) (removing a stuck bit in drilling rig).

Minnesota—*Gidlund v. Benefit Association of Railway Employees*, 210 *Minn.* 176, 297 *N. W.* 710 (*Sup. Ct.* 1941) (cranking car).

Missouri—*Pope v. Business Men's Assurance Co. of America*, 235 *Mo. App.* 263, 131 *S. W. 2d* 887 (*Ct. App.* 1939); *Pope v. Lincoln National Life Insurance Co.*, 103 *F. 2d* 265 (8 *Cir.* 1939) (extricating car from mud).

New York—*Schechter v. Equitable Life Assurance Society of the U. S.*, 275 *App. Div.* 958, 89 *N. Y. S. 2d* 654 (*App. Div.* 1949), rehearing denied 275 *App. Div.* 1002, 91 *N. Y. S. 2d* 759 (*App. Div.* 1949) (garage manager, who ordinarily did no manual work, by reason of heavy snowfall extricated cars from snow and did other work around garage); *Blumenthal v. New York Life Insurance*

---

[4] Where policies provide benefits in the event of "accidental bodily injuries," as distinct from those, as in the case at bar, conditioning payment upon sustainment of injuries "effected * * * through * * * accidental means," coverage has been found in the event of heart injury occurring as the result of a voluntary act, although the particular jurisdiction recognizes the distinction between accidental death and death resulting from accidental means. See *e. g.*, *Love v. American Casualty Co. of Reading, Pa.*, 113 *U. S. App. D. C.* 195, 306 *F. 2d* 802 (*D. C. Cir.* 1962); *Pledger v. Business Men's Accident Ass'n*, 228 *S. W.* 110 (*Tex. Comm. of Appeals*, adopted by *Sup. Ct.* 1921).

*Co.*, 11 *Misc.* 2d 484, 172 *N. Y. S.* 2d 757 (*Sup. Ct.* App. Term 1958) (unlocking auto bumpers after minor accident).

Ohio—*New Amsterdam Casualty Co. v. Johnson*, 91 *Ohio St.* 155, 110 *N. E.* 475, *L. R. A.* 1916 B, 1018 (*Sup. Ct.* 1914) (taking customary very cold bath after horseback ride).

Oregon—*Thompson v. General Insurance Company of America*, 226 *Or.* 205, 359 *P.* 2d 1097 (*Sup. Ct.* 1961) (ranchhand attempting to break two horses to harness).

Washington—*Evans v. Metropolitan Life Insurance Co.*, 26 *Wash.* 2d 594, 174 *P.* 2d 961 (*Sup. Ct.* 1946) (pushing stalled auto); cf. *Johnson v. Business Men's Assurance Co. of America*, 38 *Wash.* 2d 245, 228 *P.* 2d 760 (*Sup. Ct.* 1951) (removing contents of burning home).

Wisconsin—*Cf. Herthel v. Time Insurance Co.*, 221 *Wis.* 208, 265 *N. W.* 575 (*Sup. Ct.* 1936) (pulling boat from water to dry land).

In Texas, the state court cases are divergent, but the federal court, finding and applying state law in a diversity suit, held in line with the cases listed above. *Hartford Accident & Indemnity Co. v. Douglass*, 215 *F.* 2d 201 (5 *Cir.* 1954) (lifting heavy crate of fruit at home).

The situation in Oklahoma is equally confusing. In two cases recovery was allowed, with reference made to the *Landress* dissent. *New York Life Insurance Co. v. Wise,* 207 *Okl.* 622, 251 *P.* 2d 1058, 35 *A. L. R.* 2d 1099 (*Sup. Ct.* 1952), (pushing a stuck car on an icy street for an hour, frequently slipping and falling in the process); *New York Life Insurance Co. v. Kramer*, 324 *P.* 2d 270 (*Okl. Sup. Ct.* 1958) (trying to break down door of burning mountain cabin with an axe). But where an insured collapsed with a heart attack while doing his regular work in a factory, the court said *Wise* did not apply and found no accidental injury. *Spangenburg v. Aetna Life Insurance Co.*, 306 *P.* 2d 707 (*Okl. Sup. Ct.* 1957).

In at least three other states the result of the listed cases is indicated by reason of conclusions in analogous settings of voluntary and intentional action, although a controversy involving injury to the heart such as that at bar does not appear to have arisen. Delaware, *Metropolitan Life Insurance Co. v. Landsman*, 5 *W. W. Harr.* 384, 35 *Del.* 384, 165 *A.*

563 (*Super. Ct.* 1933) (grocery clerk sprained shoulder and back lifting sack of potatoes); *cf. Szymanska v. Equitable Life Insurance Co.,* 7 *W. W. Harr.* 272, 37 *Del.* 272, 183 *A.* 309 (*Super. Ct.* 1936); New Hampshire, *McGinley v. John Hancock Mutual Life Insurance Co.,* 88 *N. H.* 108, 184 *A.* 593 (*Sup. Ct.* 1936) (alcoholism death); Louisiana, *Parker v. Provident Life & Accident Insurance Co.,* 178 *La.* 977, 152 *So.* 583 (*Sup. Ct.* 1934) (mechanic sustained hernia from pulling hard on lever of jackscrew).

The following cases are the only decisions called to our attention or which we have been able to otherwise discover reaching a contrary conclusion in the same kind of heart injury situation.

Arkansas—*Metropolitan Casualty Insurance Co. of New York v. Fairchild,* 215 *Ark.* 416, 220 *S. W.* 2d 803 (*Sup. Ct.* 1949) (workman standing in very strained position to thaw frozen valve).

North Dakota—*Jacobson v. Mutual Benefit Health & Accident Ass'n,* 69 *N. D.* 632, 289 *N. W.* 591 (*Sup. Ct.* 1940), s. c., 70 *N. D.* 566, 296 *N. W.* 545 (*Sup. Ct.* 1941) (ranchhand attempting to load a wild horse in a truck).

In two other states the rationale and language utilized indicate that a similar result would be reached, although factually the cases are distinguishable because there was present in both instances something unforeseen or unexpected in the course of the acts preceding the heart injury. Iowa, *Lickleider v. Iowa State Traveling Men's Ass'n,* 184 *Iowa* 423, 166 *N. W.* 363 (modified 168 *N. W.* 884), 3 *A. L. R.* 1295 (*Sup. Ct.* 1918) (changing tire on car, which came off suddenly, causing a backward fall); Maine, *McGlinchy v. Fidelity & Casualty Co.,* 80 *Me.* 251, 14 *A.* 13 (*Sup. Jud. Ct.* 1888) (trying to control a runaway horse which threatened to upset wagon in which insured and his children were riding).

These *contra* cases all proceeded on the theory that an unexpected result automatically requires the means to be characterized as accidental. Only one, *McGlinchy,* suggested

that benefits ought to be paid because the common man would consider the incident to be accidental.

The heart cases denying recovery generally rely on *Barry* and the majority opinion in *Landress* as the expressed basis for the result and specifically reject the nonnatural consequence thesis. But some also speak more realistically. For example, Chief Justice Nichols of Ohio said, almost 50 years ago, in *New Amsterdam Casualty Co. v. Johnson, supra,* 110 *N. E.,* at *p.* 476:

"While the views of the laity cannot in the very nature of things be the controlling gauge wherewith to measure doubtful legal propositions, yet it might be suggested that the average business man, were the question involved in this case submitted to him, would in all likelihood be surprised if not shocked to learn that it had been held that an injury of the character suffered by the defendant in error should be followed by the payment of indemnity by a strictly accident insurance company."

That the true rationale, no matter what an opinion says, is the appraisal of the causes of the injury made by a court playing the role of the average policyholder is most clearly demonstrated by the course of the decisions in New York. That state early followed *Barry* specifically, *i. e.,* when the act which produced the unforeseen result was done exactly as intended and there was nothing unusual about it other than the result itself, only the result was accidental and it was not effected by accidental means. See, for instance, *Appel v. Aetna Life Insurance Co.,* 86 *App. Div.* 83, 83 *N. Y. S.* 238 (*App. Div.* 1903), affirmed 180 *N. Y.* 514, 72 *N. E.* 1139 (*Ct. App.* 1904) (ruptured appendix caused by the leg rubbing on that area of the body in the riding of a bicycle); *Niskern v. United Brotherhood of Carpenters & Joiners of America,* 93 *App. Div.* 364, 87 *N. Y. S.* 640 (*App. Div.* 1904) (carpenter ruptured a blood vessel in lifting heavy timbers); *Wilcox v. Mutual Life Insurance Co. of New York,* 265 *N. Y.* 665, 193 *N. E.* 436 (*Ct. App.* 1934) (construction foreman ruptured aorta in reaching to push back into proper position a heavy transformer which had slipped while being raised).

Then came *Burr v. Commercial Travelers Mutual Accident Ass'n,* 295 *N. Y.* 294, 67 *N. E. 2d* 248, 166 *A. L. R.* 462 (*Ct. App.* 1946). There the insured in an "accidental means" accident policy set out by auto with his family to drive to a nearby city in order to catch a train. A heavy snowstorm with high winds developed *en route* and the car was forced into a ditch. Unable to extricate it by use of the motor, he walked some distance in the snow and wind to a farmhouse and procured a shovel. After his return, he attempted to shovel away the snow from around the car. He slipped and fell against the shovel and then against the rear of the car. His wife assisted him into the vehicle and he collapsed and died almost immediately. The court, in sustaining recovery, first pointed out that the jury could find not only an unexpected result but also that it was brought about by the intervention of unintended and unexpected means. It then said that the judicial guide in interpreting coverage under the policy must be the reasonable expectation and purpose of the ordinary business man when making an insurance contract of the type involved.

The court followed this discussion with the flat pronouncement that in New York there was no longer any distinction between accidental death and death by accidental means nor between accidental means and accidental results. What is significant for our purpose, however, is the further statement that recovery is nonetheless not permitted in that state in so-called overexertion cases under an "accidental means" contract "when the act was the natural and customary act of a householder in or about his house, or of a workman within the scope of his duties in his calling." 67 *N. E. 2d,* at *p.* 253. Cited as still the law by reason thereof were *Appel, Niskern, Wilcox, supra,* and other decisions of similar import. Of like classifications are the heart injury cases of *Schechter* and *Blumenthal,* previously listed and decided since *Burr.* The inference is inescapable that the New York courts in reality arrive at a determination with respect to liability in accidental means policy cases by classifying them according to whether

the court, placing itself in the position of the average man, feels the end result would be considered as produced by an accidental cause. The category of cases in which no liability is found—akin to that before us—comprises those in which the court believes coverage was thus not intended. It seems clear that the court in *Burr,* as have other tribunals, felt that something of a *physical nature,* out of the ordinary, beyond the intended act or the result itself must occur before the means will be considered to be accidental. Indeed, it likened the situation in that case to one where a deceased had been thrown by accident into the water and had died from overexertion in attempting to swim ashore.

Minnesota furnishes another example of this true *ratio decidendi.* We have cited *Gidlund, supra,* 297 *N. W.* 710—a case of coronary occlusion caused by overexertion in cranking an auto. The court there followed the *Barry* thesis in denying recovery and expressly rejected the *Landress* dissent line of authority holding an unforeseen result as constituting accidental means. It said that the latter theory stretched legitimate construction of contractual language beyond sound reason. An earlier case, *Taylor v. New York Life Insurance Co.,* 176 *Minn.* 171, 222 *N. W.* 912, 60 *A. L. R.* 959 (*Sup. Ct.* 1929), in which three of the five judges who sat were later members of the unanimous seven-man court which decided *Gidlund,* held an accidental means contract provided coverage where an injection of novocaine into the insured preliminary to a tonsillectomy resulted in immediate death because of personal allergy to the drug. (New Jersey has reached the same result in an analogous case. *Korfin v. Continental Casualty Co.,* 5 *N. J.* 154 (1950).) The *Taylor* court specifically declined to follow the *Barry* approach and rested its conclusion on the natural consequence theory of *Western Commercial Travelers' Ass'n v. Smith, supra,* 85 *F.* 401. *Gidlund* never mentioned *Taylor* and, curiously, the same judge who wrote *Gidlund* was also the author in *Konschak v. Equitable Life Assurance Society,* 186 *Minn.* 423, 243 *N. W.* 691 (*Sup. Ct.*

1932), in which he said that Minnesota was committed not to the *Barry* test, but to the theory set forth in *Taylor*.

In line with the rationale and conclusions of most other jurisdictions and standing in the shoes of the average policyholder, with the admonition of *Kievit v. Loyal Protective Life Insurance Co., supra,* 34 *N. J.,* at *p.* 482–483, always in mind, we have no doubt that we should conclude, as an original proposition, that, the double indemnity provision of the policy does not apply to the facts of the case before us. But plaintiff urges strongly that the prior course of "accidental means" decisions in this State dictates, or at least strongly indicates, the contrary conclusion. While we do not agree, we should briefly review those cases.

Taken as a whole, they represent pretty much the same kind of melange in reasoning and result which we have noticed in other states in voluntary act cases. This is not said critically, but rather to emphasize that, as elsewhere, the decisions may be reconciled perhaps only on the basis that the actual rationale in each case is, in the final analysis, the particular court's conception of a fair and reasonable result on the specific facts, even though that thought may not be so candidly expressed in the language of the opinion, which ordinarily instead speaks of either the *Barry* or *Landress* dissent approach. And, there is, of course, plenty of room for difference of opinion with respect to the result in many cases or in a class of cases, as shown by differing conclusions among the states in analogous factual situations.

The New Jersey cases run the typical gamut of accident insurance controversies. As elsewhere, analysis indicates the categorization of factual settings as a fundamental basis of consideration. The first decision is *Lower v. Metropolitan Life Insurance Co.,* 111 *N. J. L.* 426 (*E. & A.* 1933), involving death by sunstroke, decided before *Landress*. Factually the case differs from *Landress* only in that the temperature appears to have been higher and the insured was a laborer engaged outdoors in his usual employment rather than in playing on a golf course. Coverage was found by reference

to the test laid down in *Barry* with reliance on what was said to be the common understanding that sunstroke is a violent injury caused by sudden and external forces, and therefore effected by accidental means. Decisions elsewhere in this category are divided, depending on whether the above conception of the nature and effect of the sun's rays or Chief Justice Stone's view thereof in *Landress* (54 *S. Ct.*, at *p.* 462, 78 *L. Ed.*, at *p.* 937) is adopted. The majority of jurisdictions presently appear to sanction recovery. See Annotation, "Death or injury from sunstroke as an accident or result of accidental means within the terms of accident provision of insurance policy," 36 *A. L. R. 2d* 1090 (1954).

Next in this State was *Lawrence v. Massachusetts Bonding & Insurance Co.*, 113 *N. J. L.* 265 (*Sup. Ct.* 1934), per Case, J., in which the insured was pitching quoits in his usual manner and wrenched his back. His trial court verdict was reversed and a new trial ordered. The *Barry* test was accepted as the criterion and it was found, on a very sparse factual record, that the means by which the injury occurred was "ordinary means, voluntarily employed, in a not unusual or unexpected way." This result follows the pattern of decisions in most jurisdictions where a hernia or bodily strain resulted from voluntary acts performed in a normal way. See Annotation, "Hernia following exertion or exercise as within terms of accident provision of insurance policy," 55 *A. L. R. 2d* 1180 (1957). (But compare a much closer division of authority where the internal injury similarly suffered was a ruptured blood vessel. Annotation, "Rupture of blood vessel following exertion or exercise as within terms of accident provision of insurance policy," 35 *A. L. R. 2d* 1105 (1954).)

A few weeks later the same judge wrote for the Court of Errors and Appeals in *Kennedy v. United States Fidelity & Guaranty Co.*, 113 *N. J. L.* 431 (1934). There the insured was driving a volunteer fire truck through a dense fog in response to an alarm. To avoid a collision with another fire engine, he made a very sudden turn of the steering wheel and died in 15 minutes from acute dilatation of the heart caused

by strain incident to the near collision. A verdict for the plaintiff was affirmed, the court holding, on application of the criterion laid down in *Lower* and *Lawrence*, that the question was properly submitted to the jury whether the insured's movements were deliberative and voluntary or an unpremeditated and subconscious reaction to the demands of a sudden peril. If the latter, the court held, the means was accidental in the sense of being instinctive, emergent and unforeseen. There is general agreement with this "spontaneous reaction" distinction throughout the country, see Annotation, "Heart attack following exertion or exercise as within terms of accident provision of insurance policy," 56 *A. L. R. 2d* 800, 816 (1957), coverage being found by states which otherwise deny recovery for heart injury suffered as in the instant case. See, *e. g., Commercial Travelers Insurance Co. v. Walsh,* 228 *F. 2d* 200, 56 *A. L. R. 2d* 796 (9 *Cir.* 1955) (Washington law).

By reason of these three foundation decisions, it was perfectly clear that, as far as expressed rationale was concerned, New Jersey proposed to speak in terms of the *Barry* approach in the ordinary voluntary act situation. Judge Jayne, after a meticulous collection and examination of cases and theories here and elsewhere, so concluded in a trial court opinion a few years later, saying that this State recognized the distinction between accidental injury and accidental means. *Cramer v. John Hancock Mutual Life Insurance Co.,* 18 *N. J. Misc.* 367, 13 *A. 2d* 651 (*Cir. Ct.* 1940).

Appellate court decisions after *Kennedy* and until 1950 may be grouped for review purposes. Two involved unwitnessed water deaths. In *Shopp v. Prudential Insurance Co.,* 115 *N. J. L.* 162 (*E. & A.* 1935), the cause of death was acute cardiac dilatation probably brought on by exertion, but without any proof as to precisely what had occurred. The insured simply had been found dead at the bottom of a pool. The evidence was held insufficient to show death by accidental means. In the other, *Riker v. John Hancock Mutual Life Insurance Co.,* 129 *N. J. L.* 508 (*Sup. Ct.* 1943), the death was by drowning while swimming and the court held there was

a sufficient possible inference of death by intervenient accidental means within the test laid down by *Barry* to create a substantial question for the trier of fact.

Four cases concerned another typical category—where the insured was the aggressor in an assault, or was claimed to have been guilty of other wrongful conduct, in the course of which he was killed by the person he had assaulted or by a third party. *Kobylakiewicz v. Prudential Insurance Co.,* 115 *N. J. L.* 382 (*Sup. Ct.* 1935); *Walters v. Prudential Insurance Co.,* 116 *N. J. L.* 304 (*E. & A.* 1935); *White v. Metropolitan Life Insurance Co.,* 118 *N. J. L.* 149 (*E. & A.* 1937), per Case, J., *s. c.* 119 *N. J. L.* 348 (*E. & A.* 1937); *McNamara v. Metropolitan Life Insurance Co.,* 134 *N. J. L.* 231 (*E. & A.* 1946). In this class of case, New Jersey, in common with practically every other jurisdiction irrespective of whether the *Barry* or *Landress* dissent approaches are taken, see Annotation, "Injury to or death of insured while assaulting another as due to accident or accidental means," 26 *A. L. R.* 2*d* 399 (1952), applies the foreseeable or probable consequences test to determine whether the death was effected by accidental means. In the four cases cited no mention is made of *Barry* or of opposing legal approaches. Their rationale is easily explainable on the basis that no reasonable person would think that an accident insurance company should be required to pay where the result was brought on by the insured under circumstances by reason of which he realized or should have realized the probability of the outcome. Justice Parker said as much in *McNamara,* 134 *N. J. L.,* at *p.* 232. This rather special factual category furnishes a very clear example of the view that the true rationale of all accidental means cases is a court's opinion of the reasonable intendment of the insurance contract through the eyes of the average policyholder.

*Wiley v. Travelers Insurance Co.,* 119 *N. J. L.* 22 (*E. & A.* 1937), may well be said to fall in the same classification. The insured pulled a hair from his nose after having been warned by his physician of the danger of septicemia. That condition

developed, causing death. Recovery was denied on the ground that the result was not an accident since the act was deliberate and the actor knew from his doctor the natural consequence of his deed or could be presumed to know it even without any prior warning. (Other states have reached the opposite result in analogous settings. See, *e. g., Lewis v. Ocean Accident & Guarantee Corp.,* 224 *N. Y.* 18, 120 *N. E.* 56, 7 *A. L. R.* 1129 (*Ct. App.* 1918).)

This brings us to 1950 and *Korfin v. Continental Casualty Co., supra,* 5 *N. J.* 154, upon which plaintiff places great reliance. There, this court was concerned with a situation in which the insured had been vaccinated against smallpox and had died some days later from post-vaccinal encephalitis caused by a non-normal hypersusceptibility or allergy to the vaccine. Recovery was allowed. The court seems to have tacitly recognized, and quite properly so, that an average policyholder would think such an occurrence within the reasonable expectation of coverage, probably because an external substance was injected into the body and caused death. It said the weight of authority permitted recovery in such factual situations and relied especially on the Minnesota case of *Taylor v. New York Life Insurance Co., supra,* 222 *N. W.* 912, to which we have previously referred. (The authorities elsewhere are sharply divided in this fact situation. Annotation, "Death or injury during or as result of surgical or dental operation, or hypodermic injection, as an accident, or effected by accidental means or by accidental cause or event, within policy of accident insurance or accidental feature of life policy," 152 *A. L. R.* 1286 (1944).) We need not comment further on the various theses of recovery discussed, including both *Barry* and the natural consequence theory.

The only case to come before this court in this field since *Korfin* was *Shields v. Prudential Insurance Co.,* 6 *N. J.* 517 (1951), an aggressor-assault situation. It was obviously controlled by the rationale of the earlier cases in this special category which we have cited. Any other observations of the court on the theories of recovery were beside the point.

It should also be noted that we are aware of a decision of the Appellate Division, *Harris v. John Hancock Mutual Life Insurance Co.*, 78 *N. J. Super.* 578 (1963), in a heart injury situation, handed down since the argument in the instant case. Certification thereof has recently been granted on application of the defendant.

In summary, we cannot acquiesce in plaintiff's contention that the prior law in this State requires, or even indicates, that we not adhere to the conclusion previously expressed, as an original proposition, that plaintiff is not entitled to recover on the facts of the case for the reasons we earlier spelled out.

Two secondary points made by plaintiff demand but little attention. The first is that the decedent's act in picking up the fallen cartons was in response to an emergency and therefore instinctive and reflexive in character rather than voluntary and intentional. Analogy to the fact situation in *Kennedy, supra,* 113 *N. J. L.* 431, is asserted. The short answer is that the trial court specifically found otherwise and our review of the record indicates that his conclusion was eminently correct. The second point is that the falling of the cartons constituted the means effecting the injury and that such falling was unexpected and therefore accidental. But, again, the trial court found that the act causing the injury (the means) was the picking up of the cartons. In any event, the falling caused Mr. Salz no injury. See *Blumenthal v. New York Life Insurance Co., supra,* 11 *Misc. 2d* 484, 172 *N. Y. S. 2d* 757, where a similar argument was made and answered likewise.

The judgment is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.