**ENTRON, INC., Plaintiff-Appellee,**

v.

**AFFILIATED FM INSURANCE CO., Defendant-Appellant.**

**No. 37, Docket 84–7170.**

United States Court of Appeals, Second Circuit.

Argued Aug. 27, 1984.

Decided Nov. 23, 1984.

J. Barry Cocoziello, Newark, N.J. (H. Richard Chattman, Podvey, Sachs & Catenacci, Newark, N.J., of counsel), Cecelia Kempler, New York City (James A. Greer, II, John T. Patterson, LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel), for defendant-appellant.

James C. Hansen, New York City (Michael E. Twomey, E. Sherrell Andrews, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND, WINTER and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge.

On this diversity appeal we are called upon to decide two issues under New Jersey law: first, whether an insurance policy which provides for reimbursement to the insured for damaged engineering drawings up to the "cost of transcription" may be interpreted to include the cost of engineering research necessary to replace information missing from the damaged drawings; and second, whether prejudgment interest may be awarded on a breach of contract claim for unliquidated damages. The district court awarded damages for engineering research and prejudgment interest, 578 F.Supp. 334, and, for the reasons set forth below, we affirm.

Entron, Inc. is a New York corporation which manufactures and supplies electronic and electro-mechanical equipment and components to private contractors and the government. At its New Jersey plant Entron maintains an inventory of thousands of master engineering and electronic drawings created by Entron and by various companies it has acquired. Entron uses these drawings to design, manufacture, and test various components and to supply spare parts to contractors.

In December 1977 a water pipe burst on the lower level of the plant building where Entron's drawings were stored. When first discovered, the water had risen to approximately two and one-half feet and had soaked 19 to 20 filing cabinets containing drawings. After notifying Entron's insurer, Affiliated FM Insurance Co., of the flood, Entron personnel began to pump out the water and dry the drawings.

Between December 1977 and May 1978 several Affiliated representatives visited the plant and discussed the loss with Entron. In April 1978 Entron submitted a written claim for loss in the amount of $976,318, which included estimates both for restoring damaged drawings to usable form and for repairing water damage to the plant and its equipment. In response to Affiliated's request, Entron prepared and, in September 1978, submitted a detailed inventory of the damaged drawings, together with a revised claim for $1,243,712.22.

The detailed inventory classified approximately 20,000 drawings according to the degree of damage they had sustained. Some were in excellent condition and needed little or no restoration; others could be readily reproduced with a printing machine or by photographic process. A small number of drawings were so badly damaged that they required redrawing. Of those, some could simply be redrawn by hand from the originals; in other cases, however, redrawing could not proceed until information missing from the drawings because of the water damage had been replaced by engineering research. It is this latter group on which the first appeal issue focuses.

In October 1978 Affiliated contested Entron's revised claim. In addition to other objections that are not relevant to this appeal, Affiliated argued that the terms of Entron's policy did not require reimbursement for the cost of engineering research. Affiliated relied on section 10, the valuation provision of the policy, which provided that "[u]nless otherwise endorsed hereon, adjustment of loss under this Policy shall be: * * * (d) on exposed film, records, manuscripts and drawings, the *value blank plus the cost of transcription* * * *" (emphasis added). Affiliated contended that this section limited its obligation for any particular

drawing to providing Entron with the value blank and a reasonable cost of photocopying or a similar process. Entron contended that the term "cost of transcription" included the cost of engineering research necessary to complete the damaged drawings, particularly because the protection offered by the policy was for "all risks of direct physical loss of or damage to" its personal property.

Attempts at settlement having failed, Entron filed suit in March 1979. After a trial in June and July 1983, the jury awarded Entron $310,681, allocated primarily between costs for photographic reproduction of the lightly damaged drawings and costs for engineering research and redrawing of those that were severely damaged.

Contending that $110,045 of the award had been improperly allocated for engineering research, Affiliated moved to reduce the judgment by that amount. Entron moved to amend the judgment to include $186,408.60 in prejudgment interest. From Judge Glasser's denial of the former motion and grant of the latter, Affiliated appeals.

### Cost of Transcription

Affiliated argues that its obligation under § 10(d) of the policy to cover "the value blank plus the cost of transcription" is limited to providing Entron with the value of the blank media (*e.g.,* light sensitive paper, vellum, or mylar) plus the reasonable cost of copying onto that blank media from a pre-existing copy or original of the drawing. Entron contends that the trial court correctly held that the term "cost of transcription" includes any research necessary to make usable copies of drawings that were missing information because of the water damage.

Construction of this clause presents a question of state law. While New Jersey courts have insisted that "clear basic terms and particular provisions of an insurance contract may not be disregarded at will and a new contract judicially made for the parties", *Linden Motor Freight Co. v. Travelers Insurance Company,* 40 N.J. 511, 193

A.2d 217, 225 (1963), they have, nevertheless, extended considerable protection to the insured in interpreting the provisions of insurance policies. "Courts are bound to protect the insured to the full extent that any fair interpretation will allow." *Mazzilli v. Accident & Casualty Insurance Company,* 35 N.J. 1, 170 A.2d 800, 803 (1961). "When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls * * *." *Kievit v. Loyal Protective Life Insurance Company,* 34 N.J. 475, 170 A.2d 22, 26 (1961). Thus, "[w]herever possible the phraseology must be liberally construed in favor of the insured; if doubtful, uncertain, or ambiguous, or reasonably susceptible of two interpretations, the construction conferring coverage is to be adopted." *Hunt v. Hospital Service Plan of New Jersey,* 33 N.J. 98, 162 A.2d 561, 563 (1960).

Citing numerous dictionaries in opposition, Affiliated argues that the phrase "cost of transcription" in § 10(d) clearly and unambiguously means the cost of copying and that the court cannot interpret it to include the cost of engineering research necessary to replace missing information. However, we should not "dwell at any length upon the semantical approach." *Linden Motor Freight Co.,* 193 A.2d at 224. Instead, we are instructed by the New Jersey courts to interpret the policy in view of "what we conceive to be the reasonable expectations of the average purchaser in the light of the contract language." *Id.*

While § 10(d) does limit Affiliated's responsibility to the "cost of transcription", the policy does not clearly spell out the meaning of this phrase and thus leaves the boundaries of coverage open for interpretation. Section 8 of the policy provides that "[e]xcept as hereinafter excluded this Policy insures against all risks of direct physical loss of or damage to the property insured." This broad language reasonably supports Entron's expectation that the poli-

cy would cover the full cost of replacing the engineering drawings, including research necessary to fill in missing information.

If Affiliated's interpretation of § 10(d) were to control, the policy would provide no meaningful coverage for engineering drawings that were severely damaged. For example, with respect to a drawing that was intact but illegible, Entron would recover only the cost of making an equally illegible copy—an obviously meaningless objective. Moreover, with a drawing that was completely destroyed, Entron would recover nothing but the cost of a blank sheet of vellum or mylar. Such an interpretation would create exactly the type of "hidden pitfall" that an insured should be protected against. As the New Jersey Supreme Court has pointed out, "Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective." *Kievit*, 170 A.2d at 26. Although Affiliated's interpretation of § 10(d) would not nullify every aspect of this comprehensive insurance policy, it would largely nullify any meaningful protection for one of Entron's valuable assets—its engineering drawings.

Affiliated further argues that it offers customers more comprehensive insurance coverages, such as its Valuable Papers and Records endorsement, that are designed to provide the kinds of protection Entron claims here, and it contends that the availability of such coverages under other policies precludes coverage of engineering research under the policy at issue. This argument is both illogical and unfair. First, it does not follow that simply because one type of insurance policy reimburses for certain losses, another type of insurance policy necessarily excludes such losses. Second, Entron's expectations under the policy it purchased cannot be determined from coverages offered in other policies if their availability was not made known to Entron, and no evidence presented at trial suggests that Entron actually had or should have had knowledge of such other policies.

Finally, New Jersey law places the burden on the insurer to carefully and precisely define the limits of its coverage. "[I]n evaluating the insurer's claim as to the meaning of the language under study, courts necessarily consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question * * *." *Mazzilli*, 170 A.2d at 803. Had it used more precise language, Affiliated could have either explicitly excluded engineering research costs from coverage or employed language similar to that in § 10(e) of the same policy where Affiliated provided that the adjustment of loss "on media [and] data storage devices" would be "the cost of reproducing such media [and] data storage devices * * * *from duplicates or from originals* of the previous generation of the data" (emphasis added). Affiliated's failure to follow either route toward precise meaning undermines its claim that the contested language is clear and unambiguous.

In view of the policy's broad inclusionary language in § 8 and Affiliated's failure to provide more precise exclusionary language in § 10(d), we conclude that the policy is ambiguous as to whether the engineering research costs are covered. Accordingly, under New Jersey law the policy must be construed to meet Entron's reasonable expectation that the cost of transcription included the cost of research needed to make the reproduced drawings usable. The district court, therefore, correctly required Affiliated to pay Entron for these costs.

### *Prejudgment Interest*

On a post-verdict motion the district court awarded Entron prejudgment interest of $186,408.60. Affiliated contends that New Jersey law applies and does not allow prejudgment interest on a contract claim such as this one which seeks unliquidated damages. Entron contends that whether New York or New Jersey law applies, the award of prejudgment interest was proper.

■■■ The first question for decision is whether the law of New York, the forum state, or the law of New Jersey, which governed the determination of liability, applies to this issue. A federal court sitting in a diversity case is bound to apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). We agree with Judge Glasser's determination that under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of New Jersey, whose law determined liability on the main claim. *See Patch v. Stanley Works (Stanley Chemical Company Division)*, 448 F.2d 483, 494 n. 18 (2d Cir.1971) (there is a "consistent line" of decisions holding that under New York choice of law principles "allowance of pre-judgment interest is controlled by the rule of the jurisdiction whose law determines liability"); *Davenport v. Webb*, 11 N.Y.2d 392, 230 N.Y.S.2d 17, 183 N.E.2d 902 (1962) (New York's prejudgment interest rule does not apply in wrongful death action governed by Maryland law).

We note in passing, however, that even if we were to apply New York law, the result would not differ. As we conclude below, New Jersey law allows prejudgment interest here, and New York law would dictate the same result. *See* N.Y.Civ.Prac.Law § 5001 (McKinney 1963).

We turn, then, to the New Jersey cases that have considered the availability of prejudgment interest. To begin with, we recognize that New Jersey law is not fully settled on this issue. In tort cases, the New Jersey Supreme Court has adopted a practice rule that permits prejudgment interest. New Jersey Civil Practice Rule 4:42–11; *Busik v. Levine*, 63 N.J. 351, 307 A.2d 571 (1973). In contract cases, if damages are liquidated, New Jersey permits the court to award prejudgment interest in accordance with principles of equity. *See Bak-A-Lum Corp. of America v. Alcoa Building Products, Inc.*, 69 N.J. 123, 351 A.2d 349, 353 (1976). Confusion arises, however, over the treatment by New Jer-

sey courts of contract claims where damages are unliquidated.

Affiliated relies on a series of intermediate New Jersey court decisions that seem automatically to deny prejudgment interest in contract actions whenever damages are unliquidated. *Deerhurst Estates v. Meadow Homes, Inc.*, 64 N.J.Super. 134, 165 A.2d 543, 553 (App.Div.1960); *Jardine Estates, Inc. v. Donna Brook Corporation*, 42 N.J.Super. 332, 126 A.2d 372, 377 (App. Div.1956).

In contrast, recent opinions of the New Jersey Supreme Court consistently suggest that prejudgment interest should be available on contract claims for unliquidated damages. In his plurality opinion in *Busik*, 307 A.2d at 575, Chief Judge Weintraub commented that with both liquidated and unliquidated claims, "the defendant has had the use, and the plaintiff has not, of moneys which the judgment finds was the damage plaintiff suffered. * * * It is said there is now, in general, a willingness to allow interest on unliquidated claims as justice may dictate." Even the dissenting opinion found "no serious objection to the principle of prejudgment interest if its application were subject to the discretion of the trial court in the particular case, as continues to be the rule on interest * * * in relation to unliquidated damages in contract cases." *Id.* at 588.

In *Manning Engineering, Inc. v. Hudson County Park Commission*, 71 N.J. 145, 364 A.2d 1, 8 (1976), *vacated on other grounds*, 74 N.J. 113, 376 A.2d 1194 (1977), after weighing the equities in a contract action, including the excessiveness of plaintiff's original claim, the debatability of the points raised by the defendant, and the unliquidated nature of the claim, the court denied prejudgment interest. Its analysis suggests, however, that the unliquidated nature of the claim is but one of many factors to be considered in determining whether prejudgment interest should be awarded. *See also National Newark and Essex Bank v. American Insurance Company*, 76 N.J. 64, 385 A.2d 1216, 1226

(1978) ("prejudgment interest with respect to judgments of an unliquidated nature on contractual claims is only chargeable where equitable"); *Hankin v. Board of Education of Hamilton Township*, 47 N.J.Super. 70, 135 A.2d 329, 337 (App.Div.1957), ("The test in a case of this kind, where the amount due is not a liquidated debt but where defendant's attitude toward payment of the obligation was substantially unwarranted, is to be found in 'considerations of justice and fair dealing.' ").

From the foregoing we interpret New Jersey case law to permit prejudgment interest on unliquidated contract claims where the trial court in its discretion determines that it is warranted by considerations of justice and fair dealing.

Affiliated takes a different tack with its reliance on *Miller v. New Jersey Insurance Underwriting Association*, 188 N.J.Super. 175, 457 A.2d 23, 32 (App.Div.1983), in which the intermediate court refused to allow prejudgment interest. Although defendant had argued there that an award of interest was inappropriate because the claim was unliquidated, the court rejected that reasoning and instead found that New Jersey Court Rule 4:42–11(b) limited awards of prejudgment interest to tort claims, unless otherwise provided by law.

We recognize that the decision of an intermediate state court on a question of state law is binding on us unless we find persuasive evidence that the highest state court would reach a different conclusion. *St. Clair v. Eastern Air Lines, Inc.*, 302 F.2d 477, 481 (2d Cir.1962). We believe, however, that the court's reasoning in *Miller* is incorrect and that the New Jersey Supreme Court would reach a different conclusion. It is true that New Jersey's Rule 4:42–11 is limited to tort actions. *Busik*, 307 A.2d at 583. However, the New Jersey Supreme Court, which promulgated that rule, did not contemplate that it would prevent awards of prejudgment interest in other types of actions. On the contrary, in *Busik*, the court rejected an equal protection challenge to Rule 4:42–11, noting that "the adoption of the rule does not foreclose

holders of other unliquidated claims [besides tort claims] from contending the circumstances which attend their scene are so like the circumstances here involved that interest should also be allowed to them." *Id.*

Thus, despite the decision in *Miller*, we agree with the district court that if called upon to decide the issue now before us, the New Jersey Supreme Court would allow prejudgment interest on claims for unliquidated damages when considerations of justice and fair dealing so dictate, notwithstanding the possible negative implications of Rule 4:42–11.

The remaining question, therefore, is whether Judge Glasser properly exercised his discretion in finding an award of prejudgment interest here "compelling". *Klein v. County of Hudson*, 187 N.J.Super. 433, 455 A.2d 491, 492 (App.Div.1982). More than six years have passed since Entron filed its proof of the loss it suffered in the 1977 flood; more than five years have passed since Entron brought suit. During that time Affiliated has had the use of, and has deprived Entron of, money that Entron was rightfully entitled to in order to replace the drawings damaged in the flood. The record discloses that defendant was responsible for a portion of this delay. For example, its major contention here has been a narrow, technical interpretation of its own policy which we find to be erroneous as a matter of law. Absent any evidence of Entron's having significantly contributed to the delay in payment for its loss, we find no error in the district court's award of prejudgment interest.

Affirmed.