426 So.2d 356 (1983)
Bobby J. PRIMM, et ux., Plaintiff-Appellant,
v.
STATE FARM FIRE & CASUALTY COMPANY, et al., Defendants-Appellees.
No. 15126-CA.
Court of Appeal of Louisiana, Second Circuit.
January 17, 1983.
Johnston, Thornton, Dawson, Hunter & Feinberg by James J. Thornton, Jr., Shreveport, for plaintiff-appellant.
Lunn, Irion, Switzer, Johnson & Salley by Harry A. Johnson, Jr., Shreveport, for defendant-appellee, State Farm Fire & Cas. Co.
Shuey & Smith by John M. Shuey, Jr., for defendants-appellees, Jimmie Kalil & Betty Kalil Copeland.
*357 Before PRICE, SEXTON and NORRIS, JJ.
SEXTON, Judge.
Plaintiff-appellants bring the instant appeal to challenge the trial court's ruling that they are not entitled to redhibitory damages for structural defects in a recently purchased home damaged by a leaky, subsurface hot water line. Plaintiff-appellants also appeal the trial court's ruling that they are not entitled to recover from their insurer for these same defects. We affirm in part, and reverse in part.
Plaintiff-appellants herein are Mr. and Mrs. Bobby J. Primm who on May 22, 1979, purchased a house from defendant-appellees Jimmie Kalil and his daughter Betty Kalil Copeland, the co-owners of the house. In addition to defendants Jimmie Kalil and Betty Copeland, the Primms sued State Farm Fire & Casualty Company, from whom the Primms purchased a homeowner's policy covering these premises.
The home which is the subject of plaintiffs' redhibitory action is located at 802 Woodmont in the Hyde Park area of Shreveport, Louisiana and was purchased by the Primms at a cost of $45,000. It is an approximately 23 year old, one-level brick home with an adjoining carport. Plaintiffs inspected this house several times before purchasing it, examining it in the company of both the real estate agents that handled the sale and Jimmie Kalil himself.
Plaintiffs moved into the residence approximately eight days after they purchased it on May 22, 1979. Mrs. Primm noticed a hot spot on the floor in front of the kitchen sink sometime during late September or early October and told her husband of this thermal condition. The Primms called a plumber, and on October 5, 1979, W.C. Chapman arrived to find and repair the leak. Mr. Chapman localized the leak using several indicia: the sound of the hissing water beneath the kitchen sink, the hot area on the floor adjacent to the kitchen floor, and an area of damp earth outside the back of the house adjacent to the kitchen sink. Mr. Chapman correctly inferred from these signs that the leak was in the hot water line which was laid beneath the concrete slab of the house.
After tunneling three to four feet beneath the slab, Mr. Chapman discovered the leak. It was located in the solder of the copper pipe T-joint which connected the hot water line to the kitchen sink. He described it as a "spray hole" which would give "a pretty good shower if you had turned it on full." He said it had occurred because the solder used to secure the T-joint had deteriorated.
After Mr. Chapman's repair work, Mr. Primm began to notice structural problems in his house which appeared subsequent to the repair. New cracks[1] appeared in the exterior bricks and mortar surrounding the casing of Mr. Primm's windows. The cracks ranged in width from a quarter to half an inch, and descended in a vertical line all the way to the concrete slab upon which the home was situated. A half-inch wide crack developed in the slab beneath the den, and extended all the way to the carport adjoining the house. The evidence is clear that these structural flaws did not exist when the home was purchased and that these structural flaws were accompanied by a number of related interior cracks which manifested themselves in the fall of 1979. The fracturing of the interior was repaired by a professional hired by Mr. Primm, but the same cracks reappeared subsequent to repair.
Plaintiffs contend the structural flaws which appeared subsequent to the repair of the house were attributable to the deteriorated solder of the copper T-joint. They theorized that the water which escaped through this leak saturated the soils beneath the house, causing these soils to move, expand and erode, destabilizing the slab foundation which rested upon these soils. The destabilization and shifting of *358 the foundation, in turn, impaired the structural integrity of the home, causing the exterior and interior defects which developed subsequent to the sale of the home and the plumbing repair.
The Primms brought this action in quanti minoris to obtain reduction of the purchase price from the defendant-vendors, seeking $17,785.08 to repair the asserted damage.
A vendee acquires an action in redhibition whenever he purchases an item which is flawed by "some vice or defect ... which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." LSA-C.C. Art. 2520. A vendee may not institute a redhibitory action on the basis of a defect which is discoverable "by simple inspection" or which, though latent, is declared by the seller to the purchaser "before or at the time of the sale." LSA-C.C. Art. 2521; LSA-C.C. Art. 2522. A vendee has the alternative, upon purchasing a defective item, of seeking an absolute avoidance of the sale or merely a reduction of the purchase price. LSA-C.C. Art. 2520; LSA-C.C. Art. 2541. Although the action for a reduction in price is not, in the classic sense, a redhibitory action, it is nevertheless "subject to the same rules and to the same limitations as the redhibitory action." LSA-C.C. Art. 2544. Thus the statutory requirements for redhibitory actions are applicable also with respect to the action in quanti minoris for a reduction of the purchase price. The statutory rulecommon to both redhibition and quanti minoris which is dispositive here, is delineated by LSA-C.C. Art. 2530: "The buyer who institutes the redhibitory action, must prove that the vice existed before the sale was made to him."
The trial court found, and we agree, that the Primms did not prove by a preponderance of the evidence that the fatal leakwhich caused the structural difficulties mentioned aboveexisted at the time of the sale. According to plaintiffs' own witness, plumber W.C. Chapman, who repaired the leak on October 5, 1979, the T-joint, at the time of the repair, "couldn't have been leaking over maybe a week or something like that ...." Mr. Chapman's testimony was somewhat vacillating, and he declared that it would be impossible for anyone to accurately and precisely gauge the exact amount of time that the leak had existed. Nevertheless, Mr. Chapman steadfastly and repeatedly indicated that, in his opinion, the leak's presence did not span the five month period between the sale of the home and the repair of the leak. Mr. Chapman based his opinion upon the amount of water present in the soil beneath the house, the absence of massive washout or erosion, and the fact that water had not visibly drained downward from the elevated knoll on which the house stood to collect on the street below it.
Mr. Chapman's assertion that the leak had not existed in May of 1979, prior to the sale, is, in our view, corroborated by the fact that Mrs. Primm did not detect an unusual degree of heat in the kitchen floor until late summer or early fall. Mr. Chapman testified that the floor was heated by the hot water which escaped from the leaky joint and sprayed directly onto the concrete slab beneath the kitchen floor. In Mr. Chapman's view, the leak need only exist a short time before the floor would be noticeably heated by the thermal energy of the escaping spray of hot water.
Plaintiffs argue that aberrantly high water and gas bills which they received for their utility usage in the months prior to the repair of the leak support the contention that the leak existed at the time of the sale. Having carefully examined these usage figures, however, we find that they do not establish that the leak existed at the time of the sale. With respect to the water consumption figures, we note that extraordinary high water usage occurred in the period of May 18 to June 26. It is impossible from examining the consumption figures for this span of time to calculate whether the high water usage began before or after the May 22 sale date. We note further that under plaintiffs' theory that the leak existed before the sale, the massive *359 water usage figures should have begun to manifest themselves prior to May 22. We find, to the contrary, that the heavy water consumption occurred subsequent to the sale, lending credence to the hypothesis that the leak occurred after the sale.
We also note that the Primms' gas consumption figures do not adequately support their theory that the hot water leak occurred prior to the sale, causing excessive amounts of gas to be expended in heating massive quantities of hot water lost to leakage. It appears to us that the noticeably exaggerated gas consumption occurred after the date of sale. In summary, the utility consumption figures cited by plaintiffs are as consistent with the theory that the leak occurred after the sale as they are with the theory that the leak occurred before the sale. They are not sufficiently probative of plaintiffs' claim that the fatal leak existed prior to the sale.
While we thus find that plaintiffs have not established by a preponderance that the leak existed prior to the sale, the issue of whether they can recover from their insurer, State Farm Fire & Casualty Company, is a totally distinct issue. The homeowner's policy issued by State Farm to the Primms provides in pertinent part that:
"We insure for all risks of physical loss to the [residence premises] except for loss caused by:
* * * * * *
"5. leakage or seepage of water or steam unless sudden and accidental from any:
* * * * * *
"c. plumbing system, including from or around any shower stall or other shower bath installation, bath tub or other plumbing fixture." (emphasis added).
The thrust of this policy language, succinctly stated, is to extend coverage to an insured for loss from water leakage or seepage if this leakage or seepage was "sudden and accidental."
We have been unable to determine that the policy term "sudden and accidental" has been construed in Louisiana. We have likewise been unable to locate a definition of "sudden" in the jurisprudence. The Random House Dictionary of the English Language, Unabridged 1966 Edition, defines "sudden" as "happening, coming, made or done quickly, without warning, or unexpectedly:... occurring without transition from the previous form, state, etc.; abrupt." Thus both unexpected and abrupt events can be said to be sudden events. A sudden event may occur quickly even though it may have been expected, as in the case of a sudden change in the weather; or "sudden" may connote an event of which there had been no anticipation but which nevertheless is not abrupt.
The jurisprudential definitions of "accidental" are found primarily in cases involving accidental deaths in life insurance policies and workmen's compensation. These cases lend little if any assistance to this inquiry because of the context in which they arise, and because the definition applicable to compensation cases is statutorily rendered.[2] The only recent definition we are able to locate not involving workmen's compensation or life insurance matters is found in Velotta v. Western Fire Insurance Company, 121 So.2d 857 (La.App. 2d Cir. 1960), where this court, in attempting to determine whether a loss was accidental and thus covered, observed:
"An accident is defined by Webster's International Dictionary, Second Edition, as `An event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event.' However, `accident,' in the legal signification, is more difficult to define. It is not a technical legal term with a clearly-defined meaning. It denotes, however, an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore, unexpected, *360 or an event happening by chance, without any human agency, or, if happening through human agency, an event which, under the circumstances, is unusual or unexpected to the person to whom it happens, and is thus distinguished from an act committed willfully or intentionally." Id. at 858 (emphasis added).
Thus melding the separately obtained definitions of "sudden" and "accidental" it appears that the critical phrase "sudden and accidental" means an event which is either abrupt (though expected), or unexpected. Also the event must occur from an unknown cause or be an unusual result of a known causeand, in the context of this case, happen without human agency.
The deterioration of the solder joint in this case was not abrupt as it obviously transpired over a period of time. Also it is not entirely unexpected that such a joint would, at some point, require repairand the cause thereof is obviously known. Thus the exclusion seems damaging to the plaintiffs' position upon initial observation.
However, recall that under the terms of the policy, damages caused by leakage or seepage are not recoverable unless such leakage or seepage occurs suddenly and accidentally. Affirmatively stated, plaintiffs may recover ifand only iftheir damages were caused by sudden and accidental leakage or seepage. However, there is a definitional anomaly or inconsistency contained in the concept "sudden and accidental/leakage or seepage." "Seepage" connotes an oozing or a passing slowly through small openings. "Leakage" contemplates a defect in a thing which allows a substance encompassed by the thing to escape. Neither "leakage" or "seepage" connote an instantaneous rupture or "bursting." The term "sudden and accidental", on the other hand, signifies an event which is unexpected, unforeseen and abrupt.
Thus the terms "leakage or seepage" and "sudden and accidental" appear contradictory. The first connotes a gradual and slow moving event while the latter connotes an abrupt or unexpected event from an unknown cause or an unusual result from a known cause. Try as we might, we are unable to reconcile the phrases and have difficulty envisioning a set of circumstances which would afford coverage. For example, it is difficult to imagine an abrupt seepage from an unknown cause. Therefore, the insurance policy has engendered a grave definitional ambiguity by coupling the term "sudden and accidental" with the term "leakage or seepage." Such an ambiguity must inure to the benefit of the policy holder.
The rules for construction of insurance policies were recently succinctly summarized by Judge Jasper Jones writing for this Court in Little v. Kalo Laboratories, Inc., 406 So.2d 678 (La.App. 2d Cir.1981), as follows:
"The interpretation of the policy most favorable to the insured must be adopted. Creole Explorations, Inc. v. Underwriters at Lloyds, 245 La. 927, 161 So.2d 768 (1964). It is the duty of the insurer to clearly express exclusions or limitations in a liability policy. Corkern v. Main Insurance Company, Chicago, Ill., 268 So.2d 138 (La.App. 1st Cir.1972); Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958). Exclusionary clauses are strictly construed. Commercial Union Ins. Co. of N.Y. v. Hardcastle, 188 So.2d 698 (La. App. 2d Cir.1966); Borden, Inc. v. Howard Trucking Co., Inc., 372 So.2d 242 (La. App. 1st Cir.1979). The burden is on the insurer to prove that an exclusion applies. Borden, Inc., supra."
Considering these rules of construction and the ambiguity we have found in the exclusion, our conclusion is that the event sued on is not excluded by the policy in question, and thus coverage is afforded. In this regard we note parenthetically that the jurisprudence we have located in other jurisdictions defining the term "sudden and accidental" rendered a conclusion similar to that which we have reached, though we are unable to locate a circumstance involving the phrase in connection with leakage or seepage of water.
*361 In City of Detroit Lakes v. Travelers Indemnity Co., 201 Minn. 26, 275 N.W. 371 (1937), the Supreme Court of Minnesota affirmed a trial jury's finding that certain losses were insured because they were "sudden and accidental" within the meaning of the insurance contract. The court observed therein that "although the factors of causation may have been gradual and even slow in operation, the [damage causing] rupturing was sudden, at least in its beginning." Id. at 372. The court thus held that an event may be "sudden", within the intendment of an insurance policy, even where it is due to causal factors which are operative over a span of time. The sudden and accidental loss therein was the cracking and warping of the metal casting of a steam engine turbine, which wore and fractured over a period of time but which apparently caused an abrupt stoppage of the steam turbine involved.
Similarly in New England Gas & Electric Association v. Ocean Accident & Guarantee Corporation, 330 Mass. 640, 116 N.E.2d 671 (1953), the Supreme Court of Massachusetts held that when "sudden and accidental" are conjunctively used, "The term accident unlimited except by the word sudden, should be given its ordinary meaning as denoting an unexpected, undesigned, and unintended happening or a mishap and as including an event which, according to the common understanding of people in general, would rightly be considered as an accident," and allowed recovery where the spindle shaft of a power plant turbine had become badly cracked in the course of its use. In Lansco, Inc. v. Dept. of Environmental Protection, 138 N.J.Super. 275, 350 A.2d 520 (Ct.Ch.Div. 1975), the sudden and accidental event upon which recovery was founded was the intentional opening of valves on oil storage tanks which discharged their contents onto the ground and into drains emptying into a nearby river. The Superior Court of New Jersey rejected the theory that the term "sudden and accidental" as employed in an insurance contract requires instantaneity. See also Allstate Ins. Co. v. Klock Oil Co., 73 A.D.2d 486, 426 N.Y.S.2d 603 (N.Y.1980).
We furthermore find, as an essential fact, that the risk covered heresudden and accidental leakage or seepagecaused the loss complained of. While as we noted in footnote number one, civil engineer Mr. Robert Jones found that some of the cracks in the exterior masonry were older cracks, the development of the large number of more recent fractures coincided with the development of the leak. Mr. Jones pointed out that the soil in the area was quite expansive and noted that the saturation of this expansive and ordinarily dry soil with the leaked water would be a likely cause of upheaval of the foundation.[3] Mr. Jones stated, furthermore, that the excavation to repair the leak was insufficient to crack the foundation.
James Newton, the laborer who was called by the plumber Mr. Chapman to tunnel under the foundation, reported that the soil was very soggy and that it was necessary for him to bail five to ten gallons of water from the hole. He also stated it was necessary to place cardboard on the bottom of the hole to keep him and Mr. Chapman from getting wet during the course of the repair work.
The building contractor Allen Owen's testimony was consistent with that of Mr. Jones. Mr. Owen opined that the house's structural damage was a result of the leakage in part because the cracks in this house were larger than those generally resulting from settling. He observed that a large crack in the foundation was located some ten feet outside of the kitchen, near the site of the leak. Mr. Owen further found various recent cracks in the sheetrock and also noted that the kitchen cabinets were out of plumb. Cracks, while located throughout the house, were mainly over doors and windows.
We find, by synthesizing the evidence presented, that plaintiffs have established *362 causation by a preponderance of the evidence. The testimony of Mr. Newton, excavator for the plumber, indicates that there was a considerable amount of water released by the leak. Mr. Chapman, the plumber, makes it clear that this leakage was only of relatively short duration. The engineer, Mr. Jones, makes it clear that this residence was located in expansive soil which had contracted due to dry conditions. In sum, the addition of this water to the dry, expansive soilduring a brief span of timeis the most likely cause of the obvious movement of this foundation.
As to the damages incurred as a result of the leakage, Mr. Owen's estimate is essentially consistent with an additional estimate obtained by plaintiffs and produced through discovery, with the exception that the Owen estimate encompasses certain elements of necessary work not included in the other estimate. For this reason, we accept the estimate of Mr. Owen in most essentials. However, Mr. Jones, the engineer, did manage to cast doubt on the necessity of using new brick on the home and we therefore delete that estimated charge. Based on these considerations, we find that plaintiffs have proven $15,000 worth of damages.
We therefore affirm the trial court in part and reverse in part. Specifically, we uphold the trial court's finding that plaintiffs did not prove by a preponderance of the evidence that the subject leak existed at the time the house was sold and affirm the trial court's rejection of plaintiffs' demands against the defendants Jimmie Kalil and Betty Kalil Copeland. We reject the trial court's determination that a coverage exclusion which denied compensation for all water losses unless due to sudden and accidental leakageprecluded the Primms from recovering from their insurer, State Farm. For the reasons previously expressed, we hereby render judgment in favor of the plaintiffs against State Farm Fire & Casualty Company in the sum of $15,000.00 together with appropriate legal interest and the costs of this litigation.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] The testimony of the engineer, Mr. Robert Jones indicates that there were some pre-existing cracks in the masonry, stemming from settling occurring shortly after construction of the house.
[2] See LSA-R.S. 23:1021(1) which defines an "accident" as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury."
[3] Mr. Jones also noted that difficulty from root systems of trees within ten feet of the residence could also cause potential upheaval.