**AMERICAN MOTORISTS INSURANCE COMPANY, Plaintiff,**

v.

**GENERAL HOST CORPORATION, and American Salt Company, Inc., Defendants.**

**Civ.A. No. 84–1802–T.**

United States District Court, D. Kansas.

July 28, 1987.

Timothy C. Russell, Patricia A. Gotschalk, Theresa W. Hajost, Drinker, Biddle & Reath, Washington, D.C., M. Kathryn Webb, Morrison, Hecker, Curtis, Kuder & Parrish, Wichita, Kan., for plaintiffs.

Thomas D. Kitch, Ron Campbell, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendants.

## OPINION AND ORDER

THEIS, Senior District Judge.

This action is an insurance dispute concerning a policy that plaintiff, American Motorists Insurance Company (hereinafter AMICO), issued to defendants. The dispute concerns two actions brought against defendants, *Miller v. Cudahy Co.* and *Brothers v. American Salt.* Specifically, defendants have asserted that AMICO is responsible to indemnify them for any damages which have been or may be awarded against them in those cases, and that AMICO has a duty to defend them, or to reimburse them for the defense expenses which they incurred, in the above cases. Plaintiff denied that the policy of insurance obligated them to defend the suits, or to pay any damages awarded. Plaintiff brought this action seeking a declaration of the respective rights and obligations of the parties. The case is currently before the Court upon plaintiff's motion for summary judgment to the effect that AMICO's policies exclude any and all obligations which it might otherwise have to the defendants regarding the above cases.

The Court is familiar with the standards governing the consideration of a motion for summary judgment. Summary judgment is a drastic remedy to be applied with caution in order to preserve a litigant's right to trial. *Machinery Center, Inc. v. Anchor National Life Insurance Co.,* 434 F.2d 1, 6 (10th Cir.1970). To rule favorably on a motion for summary judgment, the Court must first determine that the matters on file regarding the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). By its very terms, Rule 56(c) "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). Instead, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at ——, 106 S.Ct. at 2512. However, the Court must look at the record in the light most favorable to the non-moving party. *Lindley v. Amoco Production Co.,* 639 F.2d 671, 672 (10th Cir.1981). Pleadings and documentary evidence must be liberally construed in favor of the party opposing the motion. *Harman v. Diversified Medi-*

*cal Investments Corp.*, 488 F.2d 111, 113 (10th Cir.1973), *cert. denied* 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). If the facts support an inference which would permit the non-movant to prevail, summary judgment is inappropriate. *Thomas v. United States Department of Energy*, 719 F.2d 342, 344 (10th Cir.1983).

The underlying facts of this matter are relatively involved, but may be briefly summarized. Defendant American Salt Company, Inc. operates a salt company in Lyons, Kansas. In 1977, neighboring landowners filed suit in this Court, claiming that the careless operation of the salt plant had resulted in tons of salt brine polluting the environment, as a result of which the aquifer under their land had become unfit for irrigation purposes. That suit, *Miller v. Cudahy*, was brought against the Cudahy Company (of which American Salt at that time was merely an operating division) and against General Host Corporation, the parent company of Cudahy. Cudahy later changed its name to AMS Industries, and American Salt was spun off as a separate corporate entity so that today American Salt, Inc. (defendant in this action) is a wholly-owned subsidiary of AMS Industries, Inc. (*not* a defendant in this action), which in turn is a wholly-owned subsidiary of General Host Corporation (a defendant in this action).

*Miller* was a complex, contentious case, involving ten years of activity at the trial court level, and resulting in hundreds of filings and scores of written court orders, of which three may be found in the West publications: 567 F.Supp. 892 (D.Kan.1983), 592 F.Supp. 976 (D.Kan.1984) and 656 F.Supp. 316 (D.Kan.1987). For purposes of this matter, it is sufficient now to say that this Court found for plaintiffs in *Miller*, and awarded them $3.06 million in actual damages and $10 million in punitive damages. The *Brothers* case has yet to be adjudicated, but it involves essentially the same claims for essentially the same plaintiffs, differing largely in that it covers the time period beginning where the *Miller*

case ended. Beyond this, the details of defendants' pollution for over three quarters of a century, their efforts and lack thereof to address the pollution, and the damages caused by their actions are far too lengthy to be repeated here.

General Host and AMICO entered into comprehensive general liability insurance policies for policy periods from November 1, 1981 to November 1, 1984. In addition, a fourth one-year policy was entered into effective November 1, 1984, which was terminated effective June 15, 1985. These liability policies are what is known as manuscript policies, which means that the signed policy was not a "boilerplate" policy, but was negotiated between the parties as to each item. Although each policy was for one year's duration only, and a separate policy was constructed for the following years (during the 1981 through 1984 period), the changes were minor, involving primarily changes in premium amounts. The material provisions of the policies for the purposes of this case were unchanged. Therefore, the Court will refer only to the relevant policy provisions, and not hereafter be concerned with the fact that there were four consecutive policies, not one.

The manuscript policy itself is quite lengthy and comprehensive, but only certain portions are relevant to this action. Those portions are the insuring agreement, the definition of "occurrence" and an exclusion commonly referred to as the "pollution exclusion." Those portions are reproduced as follows:

AMERICAN MOTORISTS INSURANCE COMPANY ... agrees with General Host Corporation, in consideration of the payment of premium, and subject to all the terms of this policy:

### INSURING AGREEMENT

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages (including

punitive damages where permitted by law to be insured and liability assumed under contract) because of:

(a) bodily injury or property damage, ... to which this policy applies, *caused by an occurrence,* and the Company shall have the right and duty to defend any suit against the insured alleging such injury or property damage and seeking damages even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

*"Occurrence"* means: (1) with respect to bodily injury and property damage, an accident or a happening or event or a continuous or repeated exposure to conditions which results, during the policy period, in bodily injury or property damage *neither expected nor intended from the standpoint of the insured.*

This policy does not apply: ... (k) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon open land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental....*

(emphasis added)

When negotiations between AMICO and General Host for insurance coverage commenced, in the summer of 1981, the *Miller* case was already nearly four years old, and discovery was well underway (the Pretrial Order in the case was filed on March 9, 1982, only four months after the insurance coverage first began). AMICO contends that it did not receive notice of the *Miller*

action until March 19, 1984, when General Host sent them a letter demanding that they defend the action in trial, which began March 26, 1984. Defendants dispute that. Instead, they assert, and for purposes of this motion the Court accepts, that AMICO was informed of the *Miller* action before the first insurance contract was consummated. However, the case apparently was not discussed in detail, if at all, between the parties. Further, even accepting defendants' representations of when AMICO was first informed of the *Miller* case, it apparently is not disputed that General Host did not demand coverage from AMICO for the *Miller* action until the March 19, 1984, letter. AMICO advised General Host, by letter dated April 4, 1984, that it was of the opinion that it had no coverage obligation under its policies due to the pollution exclusion. The *Brothers* action was filed on September 5, 1984, and General Host notified AMICO of it by letter dated September 5, 1984, and General Host notified AMICO of it by letter dated September 18, 1984. AMICO responded on November 13, 1984 in a fashion similar to its earlier response.

AMICO argues that coverage, both as to damages and as to the costs of defense, is precluded by the pollution exclusion clause of the contract. Under that clause, damages due to the discharge or release of pollution is precluded *unless* the discharge was *both* sudden and accidental. The facts of this case, AMICO contends, show that the discharges were non-sudden and non-accidental. It contends therefore that coverage clearly is precluded by the plain language of the exclusion, from the history of the exclusion and from the near-unanimous treatment of every court which has dealt with the issue. Suggesting that American Salt's pollution practices were neither sudden nor accidental, but that the company routinely, systematically and intentionally discharged the by-products of its salt manufacturing processes into the environment for over seventy-five years, AMICO asserts that there can be no question but that the insurance contract affords General Host and its subsidiaries no coverage.

General Host, conversely, argues that the pollution exclusion is ambiguous and susceptible of more than one reasonable interpretation, and that virtually every court which has examined it has so concluded (unlike the rest of the policy in question, which is a manuscript policy, both the pollution exclusion clause and the definition of the term "occurrence" are standard insurance contract clauses, and both have been the subject of considerable judicial comment). Such ambiguity, defendants suggest, precludes summary judgment. Moreover, defendants argue that the "unexpected and unintended" aspect of the "occurrence" definitional clause must be decided from defendants' standpoint, and this again is an issue of fact which precludes summary judgment. Defendants' further argue that the parties' intent at the time of contracting is an issue which must be resolved in this matter, that AMICO is obligated to pay the costs of defending the underlying action because the complaint clearly falls within the scope of coverage, and that the pollution exclusion, even if relevant, is relevant only to American Salt's, and not to General Host's, alleged wrongdoing due to the severability provision of the contract.

Despite the complexity of the underlying facts of this case, and the comprehensive nature of the arguments for summary judgment (the filings in support or in opposition to this motion alone comprise nearly 800 pages), the Court finds that this is not a complicated matter. The question presented to the Court is simply whether the language of two provisions of the insurance contract (the "occurrence" provision and the "pollution exclusion" provision), as applied to the facts of the *Miller* case, provide or exclude coverage. Such an

insurance contract interpretation question is one ideally suited for summary judgment; the type of case for which the Supreme Court has encouraged summary judgment disposition. See *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As mentioned previously, these two provisions are standard insurance contract components which have received a great deal of judicial comment. Both parties have cited a host of cases to the Court in support of their respective positions. Despite claims of near-unanimity by both sides, it is abundantly clear that these provisions have received varied, at times cavalier, treatment. However, after examining all of the relevant cases cited by both sides,[*] the Court is persuaded that, as applied to these facts, the pollution exclusion clause is not ambiguous, and that therefore plaintiff's motion for summary judgment should be granted.

Some of the ambiguity found in defendants' cases arose from a conflict found between the definition of "occurrence," which included "a continuous or repeated exposure to conditions," and the language of the pollution exclusion clause itself, which excluded coverage unless the dispersal or discharge was "sudden and accidental." Those Courts found that coverage could not be provided for a continuous event which was required to be sudden and accidental, and therefore concluded that the clause was ambiguous. The Courts then applied the well-established rule that ambiguities are to be construed against the insurer, and proceeded with an analysis which inevitably found coverage. See, e.g.,

---

[*] Both sides have disputed the choice of law question in this case, but have argued it solely in the footnotes. Plaintiff asserts, without authority, that the law of the state of Connecticut should apply. Defendants counter that the choice of law in not so obvious, and contend that the law of New York, Illinois, or Kansas might be the relevant law instead. Neither counsel argues or cites authority for one particular state's law being the correct choice. If the Court had determined that the choice of law question was outcome determinative, it would have ordered rebriefing on the issue. Since the result the Court reaches in this Opinion and Order would have been reached under any of the above suggested jurisdictions; therefore, the Court does not find it necessary to resolve the issue.

*City of Northglenn v. Chevron USA, Inc.,* 634 F.Supp. 217, 222–23 (D.Colo.1986); *United Pacific Insurance Co. v. Van's Westlake Union, Inc.,* 34 Wash. App. 708, 664 P.2d 1262, 1266 (1983).

Other courts simply found the pollution exclusion clause ambiguous because the terms "sudden" and "accidental" were not defined in the policy, *Buckeye Union Insurance Co. v. Liberty Solvents and Chemicals Co., Inc.,* 17 Ohio App.3d 127; 477 N.E.2d 1227, 1233, (1984). Other courts, in a variation on the theme, defined the terms so as to provide coverage in the immediate situation, *Primm v. State Farm Fire and Casualty Co.,* 426 So.2d 356, 360 (La.App.1983) (an event that is "abrupt" and "unexpected"); *Family Farm Mutual Insurance Co. v. Bagley,* 64 A.D.2d 1014, 409 N.Y.S.2d 294, 295–96 (4th Dept.1978) (accidental to be determined from the perspective of the insured, something that is "unexpected, unusual or unforseen"). It has been held that the word "sudden" need not be limited to an instantaneous happening. *Shapiro v. Public Service Mutual Insurance Co.,* 19 Mass.App. 648; 477 N.E.2d 146 (1985), *rev. denied,* 395 Mass. 1102, 480 N.E.2d 24, (although in the facts of this case, the escape of the pollutants had to occur between September, 1978 and February—March 1979); *Allstate Insurance Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (4th Dept.1980). The leading case of *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.,* 186 N.J.Super 156, 451 A.2d 990 (1982), concluded that the clause was merely a restatement of the definition of "occurrence" and concluded that courts have unanimously found the clause ambiguous (an assertion which plaintiff's numerous case cites belies). *Id.* at 994. This treatment by courts led one court to remark that the pollution exclusion clause had been "construed . . . to the point of extinction." *State of New York v. INA Underwriters Insurance Co.,* 133 Misc.2d 430, 434–35; 507 N.Y.S.2d 112 (Albany, N.Y.Sup.1986).

The meaning of the words "sudden" and "accidental" are not so obscure as to make the clause containing them a nullity. Defendants have cited another court's discussion of their meaning, which this Court adopts and repeats in full:

"Sudden" means happening without previous notice or on very brief notice; unforseen; unexpected; unprepared for, *Webster's New International Dictionary* (2 ed. unabridged 1954); *Black's Law Dictionary* (4 ed.1968). "Accidental" is defined as happening unexpectedly or by chance; taking place not according to usual course. *Webster's New International Dictionary,* and *Black's Law Dictionary, supra; Furr v. Metropolitan Life Ins. Co.,* 111 N.J.Super. 596, 600, 270 A.2d 69 (Law Div.1970); *see, Linden Motor Freight Co. v. Travelers Ins. Co.,* 40 N.J. 511, 193 A.2d 217 (1963). Further, under the definition of "occurrence" contained in the policy, whether the occurrence is accidental must be viewed from the standpoint of the insured. . . .

*Lansco, Inc. v. Department of Environmental Protection,* 138 N.J.Super, 350 A.2d 520 (1975), *aff'd* 145 N.J.Super 433, 368 A.2d 363 (1976), *cert. denied,* 73 N.J. 57, 372 A.2d 322 (1977).

Adopting this or similar definitions, it should be noted that, even granting that the definition of "accidental" is a subjective one, to be determined from the standpoint of the insured, the definition of "sudden" is not a subjective definition, but an objective one. Even if "sudden" is not limited to an instantaneous happening, it still must be on brief notice, and must be unexpected. No use of the word "sudden" or "suddenly" could be consistent with an event which happened gradually or over an extended time, nor could it be consistent with an event which was anticipated or predictable. Defendants here have argued that the damage caused by the salt pollution was "accidental" because, from their standpoint, it was something they did not anticipate or expect. Even if the Court were to accept

this argument, defendants have not explained how the 50 to 75 years course of salt pollution can be characterized to fit under the objective definition of "sudden." The policy language clearly requires both.

The Court has carefully considered these and similar cases, yet cannot conclude that the pollution exclusion clause is ambiguous. The language is clear and plain, something only a lawyer's ingenuity could make ambiguous. "It strains logic to perceive ambiguity" in this clause. *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986). The contract clearly and simply provides coverage for occurrences (which include continuous or repeated exposures to conditions) *except* for damages arising out of the discharge, dispersal, release or escape of pollutants. It is not a novel idea that exceptions to a broad blanket of coverage can be made. The fact that the pollution exception contains an exception itself which serves to reinclude some events that would have been included under the occurrence clause but for the pollution exclusion clause, does not change that. The contract is clear: "occurrences," as defined, are covered *unless* the occurrences arise out of pollution events; those are not covered *unless* such pollution events are sudden and accidental. Read as a whole, the policy covers "continued and repeated exposures" except for exposures to pollution; then it covers only "sudden and accidental" events. The Court declines to contort the plain language of the policy.

The cases which have found this simple clause to be unclear and ambiguous have been severely criticized. Particularly persuasive to the Court is the analysis found at Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Georgetown L.J. 1237 (1986). The commentator there charges that "the courts have almost uniformly ignored the insurers intent and distorted the phrase 'sudden and accidental' beyond recognition. With few exceptions, the courts have extended the coverage of policies containing the pollution ex-

clusion 'to mean just what they choose it to mean.' [quoting Humpty Dumpty in L. Carroll, Through the Looking Glass at 94 (1946) ]." *Id.* at 1240. Having examined the policy and studied court-treatment which these clauses have received, the Court finds it must agree.

Furthermore, the Court is convinced that the courts in the cases cited to it by defendant would not, on these facts, have found either ambiguity in the pollution exclusion clause or coverage in the policy (courts do not, after all, rule on such matters in the abstract, but only in as they relate to the case or controversy before it). Those cases all dealt with liability which arose from the initial discharge of pollutants, whether instantaneous or ongoing, by defendant. Many of those discharges were intentional discharges, but the Courts held that the phrase "neither expected nor intended from the standpoint of the insured" in the definitional clause for "occurrence" dealt not with the discharge or dispersal, but with the resulting damage. In *each* case, whether the discharge or dispersal was intentional or not, the courts found that the damage resulting from the discharge or dispersal was unexpected, unanticipated and unintended, and therefore found coverage. *National Grange Mutual Insurance Co. v. Continental Casualty Insurance Co.*, 650 F.Supp. 1404 (S.D.N.Y.1986) (ash by-product of smelting operations deposited on various plant sites from 1970 until 1981; could not have known prior to 1982 that the ash was a hazardous substance harmful to the environment); *City of Northglenn*, 634 F.Supp. 217 (gasoline leak from underground tanks); *Mraz v. American Universal Insurance Co.*, 616 F.Supp. 1173 (D.Md.1985) (leakage from buried drums of hazardous material); *Continental Insurance Co. v. Northeastern Pharmaceutical & Chemical Co., Inc.*, No. 84–5034–CV–S–4 (*unpublished*) (W.D.Mo. June 25, 1985) [Available on WESTLAW, DCT database], *aff'd in part, rev'd in part*, 811 F.2d 1180 (8th Cir.1987) (hazardous waste disposed of on farm, court found resulting damage neither expected nor intended); *Steyer v. Westvaco Corp.*, 450 F.Supp. 384 (D.Md.

1978) (the court's recitation of facts is scant at best, but the case appears to be a complaint growing out of defendant's air pollution); *United States Fidelity and Guaranty Co. v. Armstrong*, 479 So.2d 1164 (Ala.1985) (during reconstruction of sewage system, raw sewage backed up and overflowed onto adjacent land); *Reliance Insurance Co. of Illinois v. Martin*, 126 Ill.App.3d 94, 467 N.E.2d 287 (1984) (carbon monoxide and soot entered condominium from adjacent parking garage); *Primm*, 426 So.2d 356 (leak in underground hot water line caused soil instability resulting in structural cracks in home); *Travelers Indemnity Co. v. Dingwell*, 414 A.2d 220 (Me.1980) (well water contamination from operation of industrial waste facility, complaint does not allege how pollutants were initially released—could have been suddenly and accidentally [phrase "sudden and accidental" not in this policy]); *Shapiro*, 477 N.E.2d 146 (oil leaked from underground fuel tank into surrounding waterways); *Jackson Township*, 451 A.2d 990 (negligent operation of landfill allowed seepage of pollutants into aquifer; depositing of waste found intentional, but resultant damage neither expected nor intended); *Klock Oil Co.*, 426 N.Y.S.2d 603 (leakage from underground gasoline tank alleged to affect neighboring property); *Bagley*, 409 N.Y.S.2d 294 (crop spray drifted over on neighboring vineyard); *Buckeye Union Insurance Co.*, 477 N.E.2d 1227 (hazardous waste discharged when drums ruptured, polluting soil, surface and ground water); *A–1 Sandblasting & Steamcleaning Co. Inc. v. Baiden*, 53 Or.App. 890, 632 P.2d 1377 (1981), *aff'd*, 293 Or. 17, 643 P.2d 1260 (1982) (overspray onto passing cars while painting a bridge); *Van's Westlake Union*, 664 P.2d 1262 (gasoline leak from a small hole in a pipe over a period of months).

These cases all have several variations. Some do not concern pollution at all. In some, the damaging discharge, dispersal, release or escape was intentional; in others it was accidental. But in all cases, the courts found an "occurrence" because the "damage [was] neither expected nor intend-ed from the standpoint of the insured." The same cannot be said for the case at bar. Without discussing whether defendants intended to pollute the environment, it cannot be gainsaid that such a result should have been anticipated and expected.

The underlying suit in this matter made clear that defendants knew that their operation at the Lyons, Kansas salt plant was resulting in considerable salt pollution. Complaints were received from landowners and state agencies to that effect for nearly a half century before the *Miller* action was filed, and continued with regularity until the present time. 656 F.Supp. at 319. To argue that the damage resulting from defendants' discharge of salt was unexpected or unanticipated by them is unsupportable. Without "damage neither expected nor intended from the standpoint of the insured" no "occurrence" can be found to exist; and without an occurrence, no coverage is extant.

The Court further rejects defendants' contention that the facts should be relitigated for this matter, rather than relying on the facts established in the *Miller* case. Any liability plaintiff has to defendants under this contract, it has solely based on determinations made at that trial. It is nonsensical to suggest that plaintiff is liable to defendants for a judgment given in *Miller*, but that defendant is not bound to the facts supporting that judgment.

Indeed, the only cases dealing with a discharge or dispersal over such a long period of time (the length of time is important in that it reduces the likelihood that the effects of the discharge can be unexpected) are cases cited by plaintiff in support of its position. *American Mutual Liability Insurance Co. v. Neville Chemical Co.*, 650 F.Supp. 929 (W.D.Pa.1987) (dumping of chemicals into an unlined pit over 20 years was not sudden, unexpected or accidental, but a regular course of business; clear that if contamination was expected by defendant, no coverage exists); *Grant-Southern Iron & Metal Co. v. CNA*

*Insurance Co.*, 669 F.Supp. 798 (E.D. Mich.1986) (pollution from failure of pollution control system was regular and continuous, clearly not sudden or unexpected; insurance company did not undertake to indemnify defendant against events within its own control, which it knew about); *Fischer & Porter Co. v. Liberty Mutual Insurance Co.*, 656 F.Supp. 132 (E.D.Pa.1986) (groundwater contamination as a result of "sloppy housekeeping" was a predictable result of business activities; continuous dumping was not "sudden" even if it was "accidental"; *American States Insurance Co. v. Maryland Casualty Co.*, 587 F.Supp. 1549 (E.D.Mich.1984) (continuous dumping of toxic waste from 1966 on is not in any way "sudden and accidental," and therefore no "occurrence"); *National Standard Insurance Co. v. Continental Insurance Co.*, No. CA–3–81–1015–D (*unpublished*) (N.D. Tex. Oct. 4, 1983) (cancer developed after long exposure to carcinogens emitted by defendant); *International Mineral & Chemical Co. v. Liberty Mutual Insurance Co.*, No. 84–L–50979, bench order (Cir.Ct.Ill. Jan. 6, 1987); *Techalloy Co. Inc. v. Reliance Insurance Co.*, 338 Pa.Super 1, 487 A.2d 820 (1984) ("reckless" dumping of chemical over 25 years was at best "accidental;" but was not "sudden").

In conclusion, the Court finds that the cases cited by defendants are not persuasive because, first, the Court cannot find that the pollution exclusion clause is ambiguous, as least as applied to these facts; and second, the decades long nature of the action here, coupled with the predictability of the resulting damage, precludes this event from being an "occurrence" as defined in the policy. The Court's conclusion as to this matter is buttressed by its conviction that even the courts cited by defendants, with whom this Court disagrees in part, would themselves most likely not have found coverage in this instance. The purpose of the pollution exclusion clause, which is to deny coverage to active, knowing polluters, is acknowledged by these courts. *Jackson Township*, 451 A.2d

990; *Van's Westlake Union*, 664 P.2d 1262. The leading case in the line of cases which the defendants urge this Court to follow acknowledged that an "industry, for example, which is put on notice that its emissions are a potential hazard to the environment and who continues those emissions is an active polluter excluded from coverage." *Jackson Township, supra* 451 A.2d at 994. It is hard to conceive of being "put on notice" any more effectively than defendants here, who were on notice for 50 years.

A final observation also supports the Court's conclusion, although it was neither necessary to it nor a factor in reaching it. The Court has no question that, when this coverage was initiated, neither side believed that it applied to the *Miller* action. From the insurer's point of view, it is inconceivable that AMICO, knowing of the *Miller* litigation which was ongoing at the time insurance negotiations were begun, would have been willing to contract to provide all future defense costs and indemnify General Host against any losses in that existing matter. From the insured's point of view, it is apparent that they did not initially believe the policy covered this matter either; else why would they have waited over two years after the policy became extant to demand coverage from AMICO? That they did not believe the policy covered the *Miller* action is further evidenced by their letter of March 22, 1982 to AMICO consenting to "leave the pollution exclusion as is, with broadened pollution coverage to be provided under a Pollution Liability Policy." Dk. 50, Appendix 1. The broadened coverage was never obtained, but this communication shows that defendants understood the limited nature of their pollution coverage under the general policy with its pollution exclusion clause.

The Court's finding that the language of the policy precludes coverage moots the remaining issues. While the Court recognizes the well established rule of law that an insurance company's duty to defend is much broader than its duty to indemnify,

the Court's finding that the pollution exclusion clause is not ambiguous as applied to these facts, and that the events underlying the *Miller* action are not an "occurrence" within the meaning of the policy, made it clear from the outset that AMICO had no obligations to defendants as to the *Miller* case. The Court finds that AMICO's initial letter in response to defendants demand was well supported. Further, the Court's finding that there was not an "occurrence" moots defendant's severability argument that the policy provided coverage to General Host even if the pollution exclusion precluded coverage to American Salt. There was no "occurrence" to be covered.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment is hereby granted; and that plaintiff is found to have no obligations to defendants under the policy of insurance for the costs of defending the *Miller* or *Brothers* actions, or for any damages awarded in those actions.