Theresa G. MASTROIANNI, Plaintiff,

v.

UNUM PROVIDENT CORPORATION,
successor to The Paul Revere, Life
Insurance Company, Defendant.

Civil Action No. 01–4787.

United States District Court,
D. New Jersey.

Oct. 16, 2003.

Charles N. Riley, Esquire, Riley & Sandilos, Cherry Hill, NJ, for Plaintiff.

Adam A. Alster, Esquire, White & Williams, Paramus, NJ, for Defendant.

## OPINION

RODRIGUEZ, District Judge.

This matter is before the Court on Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. For the reasons set forth below, Plaintiff's motion will be granted.

## BACKGROUND

The following facts are undisputed by the parties. Plaintiff Theresa G. Mastroianni ("Mastroianni") began her career as a self-employed certified shorthand court reporter in 1976. In August 1997, Mastroianni began feeling pain, numbness, tingling, loss of dexterity and weakness in her elbows down to her fingers. By June 1998, she was diagnosed with cubital tunnel syndrome ("CTS"), which was caused by the overuse and hyperflexion of her elbows on a repetitive basis. Prior to August 1997, Mastroianni had no medical problems and enjoyed good health, and it is clear that her occupation as a court reporter caused her CTS.

In April 1998, Mastroianni ceased working as a court reporter and applied for total disability benefits under a disability insurance policy ("Policy") Mastroianni purchased in July 1986 from Defendant The Paul Revere Life Insurance Company ("Paul Revere"). Paul Revere began paying benefits to Mastroianni under the "sickness" portion of the Policy, which would provide benefits until Mastroianni reached the age of sixty-five. Mastroianni believed that she should receive benefits under the Policy's "injury" provision, which would provide lifetime benefits. Mastroianni filed a Complaint in the Superior Court of New Jersey, Law Division, requesting a declaration that her disability is due to injury under the terms of the Policy. Paul Revere removed the action to this Court.

Each party seeks summary judgment in its favor. Mastroianni and Paul Revere agree that the only issue presented is whether Mastroianni should receive benefits under the Policy's "injury" or "sickness" provision.

## DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving

party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *accord* Fed.R.Civ.P. 56(c). Thus, a court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

## B. The Policy

Mastroianni's Policy with Paul Revere states in relevant part:

"Total Disability" means that because of injury or sickness ... You are unable to perform the important duties of Your regular occupation; and ... You are not engaged in any other gainful occupation; and ... You are under the regular and personal care of a Physician.

"Injury" means accidental bodily injury sustained after the Date of Issue and while Your Policy is in force.

"Sickness" means sickness or disease other than a Pre-existing Condition which causes loss commencing while Your Policy is in force.

## C. Insurance Contract Interpretation Under New Jersey Law

Both Mastroianni and Paul Revere agree that there is no issue of material fact, and that one of the parties will be entitled to judgment as a matter of law. The matter of law to be determined is the interpretation of the Policy's "total disability" benefit, which would then indicate whether the "injury" or "sickness" provision applies to Mastroianni's cubital tunnel syndrome.

Both parties also agree that New Jersey law governs the interpretation of the Policy. It is the duty of a federal court sitting in diversity to "predict the course that the New Jersey Supreme Court would take if presented with the [same] legal issue." *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983).

In New Jersey, insurance contracts are given special scrutiny because of the "stark imbalance between insurance companies and insureds in their respective understanding of the terms and conditions of insurance policies." *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 775 A.2d 1262, 1264 (N.J.2001) (citation omitted). In the absence of ambiguity, insurance policies should be given their plain, ordinary meaning, and courts should not write a better policy for the insured than the one purchased. *Id.* (citations omitted). Insurance contracts are subject to special rules of interpretation, however, because they are contracts of adhesion. *Id.* (citations omitted). When there is ambiguity the insurance policy should be interpreted to "comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning." *Id.* (citations omitted).

In interpreting Mastroianni's insurance contract with Paul Revere, two key phrases in the Policy must be defined in order to determine the duration of benefits owed to Mastroianni: "accidental bodily injury" and "sickness or disease." The distinction between the two terms is significant, because if Mastroianni's disability is not classified as an "accidental bodily injury," it could be deemed a "sickness or disease," which would directly affect the amount of benefits paid.

New Jersey courts have struggled to define these two terms, particularly concerning what constitutes an accidental injury. *See, e.g., Linden Motor Freight Co.*,

*Inc. v. Travelers Ins. Co.,* 40 N.J. 511, 193 A.2d 217 (N.J.1963). "The broad words 'accident' and 'accidental'—in their common and popular sense of something unforeseen, unexpected, unusual . . .—necessarily encompass many varied types of happenings and what they should or should not include in an insurance policy largely depends on the viewpoint of the person whose judgment is to govern." *Id.* at 223. The New Jersey courts have interpreted insurance policies that cover accidental bodily injuries as providing coverage for either "accidental means" injuries or "accidental results" injuries, depending on the context of the term in the policy and the nature of the injury itself. *See id.* at 219, 232; *Gottfried v. Prudential Ins. Co.,* 173 N.J.Super. 381, 414 A.2d 551, 551 (N.J.Super.Ct.App.Div.1979) (Kole, J., dissenting), *rev'd,* 82 N.J. 478, 414 A.2d 544 (N.J.1980) (reversing the appellate court substantially for the reasons expressed in the dissenting opinion).

Specifically, the term "accidental bodily injury" was defined in *Gottfried.* There, a forty-four year old man died of acute myocardial infarction after eating a light dinner, playing a vigorous forty-five minute basketball game, and walking up an incline. *Gottfried,* 414 A.2d at 552. The decedent had no prior history of heart problems and enjoyed generally good health. *Id.* A doctor testified that all men at about the age of twenty develop a condition called coronary arteriosclerosis, but the condition does not become a disease until certain symptoms develop. *Id.* In this case, the dinner, basketball game, and walk uphill caused the condition to develop into a disease, resulting in the decedent's heart attack, which would not have occurred but for the decedent's voluntary strenuous activity. *Id.* at 553.

The decedent's wife applied for accidental death benefits from her husband's life insurance policies, which extended coverage for "accidental bodily injury." *Id.* at 552, 553. The insurance company denied coverage, stating that coverage was intended for death resulting from some unforeseen and unexpected "accident," not an accidental death resulting from voluntary exertion. *Id.* at 552. The trial and appellate courts agreed with the insurance company, and found that policies providing for "accidental bodily injury" insured against injuries caused by "accidental means or causes," and that the decedent's heart attack, although itself unforeseen and unexpected, was not caused by an unexpected or involuntary action. *Id.* at 553.

The New Jersey Supreme Court reversed the appellate court for the reasons set forth in Appellate Judge Kole's dissenting opinion. *Gottfried v. Prudential Ins. Co.,* 82 N.J. 478, 414 A.2d 544 (N.J. 1980). After reviewing United States Supreme Court, New Jersey Supreme Court, and other state courts' holdings on their distinction between "accidental means" and "accidental results" insurance policies, Judge Kole determined, and the supreme court approved, that policies providing coverage for "accidental bodily injury" are "accidental results" policies. *See Gottfried,* 414 A.2d at 551, 553–57. Judge Kole based his determination on the reasonable expectation of the policyholder in the facts particular to this case. *Id.* at 556. He stated, "[T]he reasonable expectation of a policyholder, faced with the facts in this case (including the lack of knowledge of any preexisting disease), is that a heart attack following strenuous physical activity, even though voluntary, would constitute an 'accidental bodily injury.' " *Id.*

Judge Kole further distinguished the situation of a heart attack following strenuous activity with an insured suffering a heart attack while at rest. *Id.* He stated that there would be no recovery for a

heart attack at rest because there would be no "unusual causing incident in the eyes of the average insured; it would be considered 'natural' instead of 'accidental.'" *Id.* In attempting to assuage the insurance companies' fear that a decision for the decedent's wife would render all sudden deaths "accidental," Judge Kole further specified that if the forty-four year old decedent had been sixty-five years old, the decedent's wife might not recover. *Id.* Judge Kole suggested that insurance companies could "easily avoid coverage for such injuries or deaths by adopting language requiring accidental causation or means." *Id.*

Although the proposition that insurance policies providing for "accidental bodily injury" are "accidental results" policies seems straightforward, in application the distinction between an accidentally-caused injury and an accidentally-resulting injury is often difficult to determine. Even Judge Kole struggled to make the distinction, as he espoused an "accidental results" view, but stated that under the same "accidental bodily injury policy" a man who dies "naturally," but suddenly, from heart disease would not be covered under the policy because there would be no unusual *causing* incident to trigger the expectation of coverage in the mind of the policyholder. Judge Kole also did not explain why a sixty-five year old man in an identical situation as the forty-four year old man would not receive benefits under the "accidental results" policy. It appears, as Judge Kole states, the result in *Gottfried* was decided on the particular facts of the case, and the reasonable expectation of the decedent's wife, and does not provide a bright line rule with which to uniformly apply to all insurance policies providing coverage for "accidental bodily injury."

No other case law in New Jersey attempts to clarify the distinction between "accidental means" or "accidental results" when an insurance policy only provides coverage for "accidental bodily injury," without any other qualifying language or without specifying whether the injury must be caused by an accident or whether the injury suffered must be accidental. It would seem that an "accidental results" policy would disregard whether the cause of the injury was accidental, and instead look to whether the resulting injury was unintentional or unforeseen. That is, based on the reasoning of Judge Kole, even if an insured voluntarily undertakes an activity, if that person is injured accidentally from that activity, then the "accidental bodily injury" policy should provide coverage.

This distinction may be useful in cases where there is a single-occurrence injury, such as a heart attack or broken bone. If, based on the reasonable expectations of the policyholder, the voluntary activity resulted in an unexpected, unforeseen or otherwise "accidental" injury, such as a heart attack, then the insurance policy providing coverage for "accidental bodily injury" should pay out benefits. In cases where a continuous voluntary activity results in repetitive-occurrence injuries, however, the distinction between "accidental means" and "accidental results" does not offer much assistance in determining whether benefits should be paid out of the "accidental bodily injury" policy. Mastroianni's situation is such a case.

## D. The Parties' Arguments

The New Jersey courts have not yet determined whether repetitive stress disabilities, such as Mastroianni's cubital tunnel syndrome, qualify under "accidental bodily injury" insurance policies. Mastroianni argues that her CTS is a bodily injury that is the accidental result of repetitive movements performed during her oc-

cupation as a court reporter. Paul Revere argues that no accident caused Mastroianni's CTS and that her disability is a sickness rather than an accidental injury. Each party supports its proposition with case law from other states.

### 1. Mastroianni's Position

Mastroianni analogizes her situation with an almost identical one decided under Georgia law. In *Hallum v. Provident Life and Accident Ins. Co.*, 289 F.3d 1350 (11th Cir.2003), a physician was diagnosed with carpal tunnel syndrome, which was caused by thirty years of repetitive hand motions required by his obstetrics/gynecological practice. *Hallum*, 289 F.3d at 1352–53. The physician submitted a claim to his insurance company for total disability benefits under his policy, which provided total disability benefits if his disability was due to injuries or sickness. *Id.* at 1351. The policy defined "injuries" as "accidental bodily injuries occurring while your policy is in force," and defined "sickness" as "sickness or disease which is first manifested while your policy is in force." *Id.* If the physician's CTS was classified as an "injury," he would receive lifetime benefits, but if the CTS was classified as a "sickness," he would receive benefits for forty-eight months. *See id.*

The insurance company paid the physician benefits under the "sickness" provision of the policy, and refused to approve the claim under the "injuries" provision. *Id.* at 1352. The physician filed a complaint in Georgia state court seeking a determination of whether his disability was due to "injury" or "sickness" as defined by the policy, and whether he was entitled to benefits under the "injuries" provision of the policy. *Id.* The insurance company removed the action to the United States District Court for the Northern District of Georgia, and the district court granted summary judgment in favor of the physician. *Id.* at 1352, 1353. The court first determined that, based on the testimony of the physician's treating doctors, that the physician's CTS was " 'due to an injury and not a sickness or disease.' " *Id.* at 1353. The court then determined that the policy was ambiguous and must be construed against the insurance company, and that the term "accidental" described "the nature, not the cause, of the injury." *Id.* The court also found that the physician's CTS was an "injury" under Georgia's workers' compensation statute. *Id.*

The insurance company appealed the district court's decision, and the Eleventh Circuit Court of Appeals certified to the Georgia Supreme Court the following question:

> WHETHER, UNDER GEORGIA LAW, CARPAL TUNNEL SYNDROME, WHICH IS CAUSED BY REPETITIVE HAND MOTION, IS MORE PROPERLY CLASSIFIED AS AN "INJURY" UNDER THE PROVISIONS OF A DISABILITY INCOME INSURANCE POLICY WHICH DEFINE AN "INJURY" TO MEAN "ACCIDENTAL BODILY INJURIES OCCURRING WHILE YOUR POLICY IS IN FORCE," OR WHETHER CARPAL TUNNEL SYNDROME IS MORE PROPERLY CLASSIFIED AS A "SICKNESS" UNDER THE PROVISIONS OF THE SAME POLICY WHICH DEFINE "SICKNESS" TO MEAN "SICKNESS OR DISEASE WHICH IS FIRST MANIFESTED WHILE YOUR POLICY IS IN EFFECT?"

*Id.* at 1354.

The Georgia Supreme Court held that, under Georgia law, "a person who unexpectedly suffers from carpal tunnel syndrome brought on by years of voluntary repetitive hand movements that renders

him disabled has suffered an 'injury,' as that term is defined" in the insurance policy. *Provident Life & Accident Ins. Co. v. Hallum,* 276 Ga. 147, 576 S.E.2d 849, 850 (Ga.2003). The court explained that Georgia law distinguishes between accidental injuries and injuries caused by accidental means. *Id.* at 851. An "accidental injury" is an injury that is unexpected but arises from a conscious voluntary act, and an "accidental means" injury is one that is "an unexpected result of an unforeseen or unexpected act that was involuntarily or unintentionally done." *Id.*

The court further explained that the words "accidental bodily injuries," as used in the policy, means an unexpected injury that could have arisen from a voluntary act, and that "by using 'accidental' to modify 'bodily injuries,' as opposed to modifying the cause or means of any injuries, the ... policy places the focus of the coverage on the injuries, not the means that caused the injury." *Id.* The court rejected the insurance company's argument that "accidental bodily injuries" means that the injury must have "resulted from a discrete event that occurred at a certain time and place," and that because the physician "cannot identify a specific incident that resulted in his condition, his disability is not due to an injury." *Id.* The court stated that the insurance company's argument is not supported by the terms of the policy or Georgia law, and concluded that the "policy covers bodily injuries that resulted from a series of actions over an extended period, as well as those that were caused by a single cataclysmic event." *Id.* After considering the Georgia Supreme Court's answer to the certified question, and reviewing the record, the Eleventh Circuit Court of Appeals held that the district court properly granted summary judgment in favor of the physician. *Hallum v. Provident Life & Accident Ins. Co.,* 326 F.3d 1374, 1375 (11th Cir.2003).

Mastroianni argues that, as demonstrated by *Gottfried,* New Jersey law parallels Georgia law because New Jersey also recognizes the distinction between an unexpected injury caused by an unforeseen involuntary act and an unexpected injury resulting from a voluntary act. Mastroianni also points out that Paul Revere's Policy language and the policy language in *Hallum* are substantively identical, and that the Georgia Supreme Court's interpretation of "accidental bodily injury" should be adopted because of the similarities between Georgia law and New Jersey law.

Mastroianni also analogizes the physician's carpal tunnel syndrome in *Hallum* with her cubital tunnel syndrome. Just as the physician's disability, which resulted from thirty years of repetitive movements required by his occupation, was diagnosed by his doctors as an "injury," Mastroianni's disability, which resulted from twenty-two years of repetitive movements required by her occupation, is due to an injury not a disease or sickness. To support her contention, Mastroianni submits a letter from William G. DeLong, Jr., M.D. of the Penn Musculoskeletal Institute, who reviewed Mastroianni's file and personally examined her. Dr. DeLong states, "[C]ubital tunnel syndrome is not a sickness. Further, it is not a disease and has never been categorized as a disease in any of the medical literature that I have perused over the last 20 years.... [It] is caused by an injury." (Pl.Ex.B.)

Thus, because the policy in *Hallum* and Mastroianni's policy use substantively identical language, both New Jersey and Georgia recognize the distinction between "accidental means" and "accidental results" policy language, and cubital tunnel syndrome is due to an injury not a disease, Mastroianni argues that she should be

paid lifetime benefits under the Policy's "injury" provision.

### 2. Paul Revere's Position

Paul Revere argues the completely opposite result, and uses a case decided under Michigan law to support its position. In *Nehra v. Provident Life and Accident Ins. Co.*, 454 Mich. 110, 559 N.W.2d 48 (Mich.1997), a dentist was diagnosed with carpal tunnel syndrome and a duodenal ulcer with hemorrhage and applied for total disability benefits under his insurance policy. *Nehra*, 559 N.W.2d at 49. The policy provided benefits for total disability due to "injury," which was defined as "accidental bodily injuries occurring while your policy is in force," or "sickness," which was defined as "sickness or disease which is first manifested while your policy is in force." *Id.* On the claim form, the dentist answered the questions relating to "sickness" but left unanswered questions relating to "injuries." *Id.* The insurance company began paying the dentist under the "sickness" provision of the policy, but when the ulcer resolved itself two years later, the dentist attempted to reclassify his benefits under the "injury" provision. *Id.* The insurance company refused to recognize his carpal tunnel syndrome as an "injury," and the dentist's benefits expired under the "sickness" provision when he reached sixty-five years of age. *Id.*

The dentist filed a complaint in Michigan state court seeking a declaratory judgment that his carpal tunnel syndrome was an "injury." *Id.* After discovery, the insurance company moved for summary judgment on the ground that the dentist's condition was not an "accidental bodily injury," and the court granted the motion. *Id.* The court based its decision on a review of Michigan's no-fault insurance cases, which have held that the phrase "accidental bodily injury" as used in the no-fault act is an injury resulting from a single accident, having a temporal and spatial location. *Id.* at 50 (citation omitted). The dentist appealed, and the court of appeals set aside the summary judgment, stating that the phrase "accidental bodily injury" is ambiguous and that the holdings in the no-fault cases were limited to no-fault law. *Id.* The insurance company appealed the appeals court decision to the Michigan Supreme Court, which reversed the appeals court and reinstated the trial court's judgment. *Id.* at 50, 51.

The Michigan Supreme Court explained that the word "accidental" is "not ambiguous insofar as its ordinary meaning includes the temporal and spatial elements discussed in the no-fault cases." *Id.* at 51. The court stated that the dentist had not suffered a discrete injury, and if an accidental injury "can occur naturally over a long period of time, then the only injuries that are not accidental are those that are intentionally inflicted." *Id.* Thus, because carpal tunnel syndrome is the prolonged repetition of hand movements, and no single event caused the dentist's disability, the temporal and spatial elements of the term "accidental" are not met. *Id.* The court concluded by stating that the dentist "himself recognized the true nature of his disability when he initially identified it as a 'sickness,' not as an 'accidental bodily injury,'" and, consequently, the trial court "did not err in agreeing with this assessment." *Id.*

Paul Revere argues that New Jersey law parallels Michigan law, and the interpretation of the insurance policy in *Nehra* should be applied to Mastroianni's Policy. Paul Revere contends that the decision in *Gottfried* demonstrates a temporal and spatial requirement because the decedent's heart attack "occurred on one single occasion and was unexpected due to the insured's never having had a previous heart

condition." (Def. Mem. Supp. Summ. J. at 20.) Paul Revere further argues that the word "sustained" in the "injury" provision ("accidental bodily injury sustained after the date of issue and while the policy is in force") indicates that a spatial and temporal element is required. Paul Revere provides the definition of the word "sustain" from Black's Law Dictionary, "to suffer; bear; undergo," and extrapolates that the use of the past tense "sustained" changes the meaning of the word "sustain" to "suffered," and that this "effect makes the word 'sustained,' as used in the policy definition of 'injury,' have the same temporal and spatial component discussed in *Nehra.*" (*Id.* at 15.) Paul Revere makes the same argument with the word "commencing" in the "sickness" provision.

Paul Revere also contends that because Mastroianni's CTS resulted from years of repetitive movements, just like the dentist's disability in *Nehra,* no single injury occurred, and it therefore cannot be attributed to an accident or be considered "accidental." Further, Paul Revere argues that cubital tunnel syndrome cannot be classified as an "accidental bodily injury" because it is not an unexpected or unforeseeable consequence of court reporting, and points out that Mastroianni was aware of the possibility of developing CTS because she knew another court reporter who had suffered from it. Paul Revere distinguishes *Gottfried* by pointing out that the decedent had no symptoms prior to the heart attack, while Mastroianni did not suffer a sudden onset of her disability. Rather, her symptoms began in the summer of 1997 and increased until she stopped working as a court reporter in April 1998.

Finally, Paul Revere contends that CTS is a "sickness" under the Policy. Paul Revere looks to various dictionaries to define the words "sickness," "disease," and "syndrome" to support its argument. It also presents a letter from Arthur P. Vasen, M.D., Ph.D. of Seaview Orthopaedic & Medical Associates, who reviewed Mastroianni's file. (Def.Ex.9.) Dr. Vasen states that Stedman's Medical Dictionary defines "syndrome" as " 'the aggregate of signs and symptoms associated with any morbid process and constituting together the picture of the disease,' " and that in his "medical opinion within a reasonable degree of medical certainty that the cubital tunnel syndrome which [Mastroianni] describes is a disease process analogous to a sickness or medical condition." (*Id.*) Dr. Vasen further states that he "did not see any evidence of any type of accidental bodily injury or anything that occurred from an external effect that would cause her bilateral cubital tunnel syndrome." (*Id.*)

Thus, because Mastroianni's CTS does not meet the temporal and spacial requirement, the CTS was not caused by an accident, the CTS was not unforeseeable, and CTS is a sickness, Paul Revere argues that Mastroianni should continue being paid benefits under the "sickness" provision of her Policy.[1]

### E. Analysis

◼ The Court must predict the course that the New Jersey Supreme Court would

---

1. Paul Revere also contends that because CTS would qualify as an "occupational disease" under New Jersey's Workers' Compensation Act, Mastroianni's CTS should be classified as a "sickness or disease." (Def. Opp. to Pl.'s Motion for Sum. J. at 10.) This argument will not be addressed because "private accident insurance is not legislatively directed to serve the beneficent social purpose of workmen's compensation and cannot fairly be construed as if in parity." *Linden Motor Freight Co., Inc. v. Travelers Ins. Co.,* 40 N.J. 511, 193 A.2d 217, 224 (N.J.1963).

take if presented with Mastroianni's and Paul Revere's arguments. The issues to be determined are: 1) whether New Jersey recognizes "accidental results" insurance policies; 2) how the Policy should be interpreted; and 3) whether Mastroianni should receive benefits under the "accidental bodily injury" provision of the Policy.

### 1. New Jersey Recognizes "Accidental Results" Insurance Policies

 It is evident from *Gottfried* and other New Jersey cases that the state recognizes the distinction between "accidental means" and "accidental results" insurance policies. *See Oldring v. Metropolitan Life Ins. Co.*, 492 F.Supp. 994, 997 (D.N.J.1980) (citing *Perrine v. Prudential Ins. Co. of Am.*, 56 N.J. 120, 265 A.2d 521, 523 (N.J.1970)). Similar to the analysis of Georgia law in *Hallum*, New Jersey case law suggests that when the phrase "accidental bodily injuries" is not further defined, it may cover injuries sustained from voluntary acts.

Here, the Policy states, " 'Injury' means accidental bodily injury sustained after the Date of Issue while Your Policy is in force." The word "sustained" adds nothing to indicate whether the bodily injury must be caused by an accident or whether the resulting injury must be accidental. All the word "sustained" requires is that the injury occurs during the period the Policy is in force. Thus, because the Policy language does not explicitly modify the phrase "accidental bodily injury," the Policy may be deemed to provide "accidental results" coverage.[2]

### 2. The Policy is Ambiguous and Should be Interpreted to Comport with Mastroianni's Reasonable Expectations

 Under New Jersey law, ambiguous insurance contract language is construed against the insurer and should be interpreted to comport with the reasonable expectations of the insured. *Allen v. Metropolitan Life Ins. Co.*, 44 N.J. 294, 208 A.2d 638, 644 (N.J.1965). Policyholders "should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.' " *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 170 A.2d 22, 26 (N.J.1961) (citations omitted). To determine the reasonable expectations of the insured specifically concerning the interpretation of "accidental injury," the test is

> whether the average policyholder would consider that there was something about the preceding acts and events, in the light of the unexpected injurious result and at the same time having in mind the limiting language of the insuring clause, which would lead him reasonably to call the means "accidental," even though, strictly speaking, nothing unexpected or unforeseen occurred in the course of the preceding acts.

*Perrine*, 265 A.2d at 524.

First, the Policy is ambiguous, which is evidenced by the present litigation and analysis. Second, because the Policy is ambiguous, it must be interpreted to comport with Mastroianni's reasonable expectations. Mastroianni has believed from

---

2. Contrast, for example, insurance policy language such as "bodily injuries effected through accidental means." *Linden Motor Freight Co., Inc. v. Travelers Ins. Co.*, 40 N.J. 511, 193 A.2d 217, 224 (N.J.1963). The New Jersey Supreme Court held that the explicit "accidental means" language in the policy could not be construed to cover "accidental results." *Id.* at 225.

the first time she completed her application for disability benefits that her CTS was an injury: on the "Claimant's Statement for Disability Benefits," Mastroianni completed the "If Accident" portion and left blank the "If Sickness" portion (*See* Def. Ex. 3); Mastroianni continuously indicated on her progress reports to Paul Revere that her disability was due to an accident, not a sickness (*See* Letter from David P. Mero II, Paul Revere Senior Customer Care Specialist, Def. Ex. 7); and, her doctors informed her that CTS was an injury caused by repetitive hand movements as a result of her occupation as a court reporter.

Further, although Mastroianni voluntarily engaged in the repetitive motions required by court reporting, the development of CTS was unexpected and unforeseen. Prior to the summer of 1997, when she first developed pain, Mastroianni did not know that cubital tunnel syndrome may have been a risk associated with court reporting. (Pl. Dep. at 59.) But, even if Mastroianni did know that court reporters could develop CTS, Mastroianni did not expect to experience pain and numbness in her elbows while performing her duties. She had never had any pain or other trauma to her elbows prior to 1997, and in Mastroianni's mind, as indicated by her submissions to Paul Revere, her disability was a result of an unforeseen injury caused by the repetitive movements required by her occupation. Mastroianni never considered her disability to be anything other than the result of an injury, and Paul Revere's classification of her disability as a sickness was contrary to her understanding of her condition. (*See* Mero Letter, Def. Ex. 7.)

Based on her doctor's diagnosis and explanation of CTS, as well as her own understanding of her disability, Mastroianni reasonably believed that her disability was a result of an accidental injury. Mastroianni certainly did not intend to develop CTS, she had no foreknowledge of CTS in order to take steps to help prevent it, and she believed that her disability was an injury caused by repeated trauma to nerves in her arms. Thus, Mastroianni had a reasonable expectation that she would be paid benefits under the "accidental bodily injury" provision of the Policy.

### 3. Mastroianni Should Receive Benefits Under the Policy's "Accidental Bodily Injury" Provision

Paul Revere argues that Mastroianni's CTS is a "sickness," not an "injury," based on the fact that Mastroianni did not suffer one discrete injury as required by the policy language. Paul Revere contends that the legal and medical dictionary definitions of the words "accidental," "sustained," "commencing," "syndrome," "disease," and "sickness" all demonstrate that a repetitive stress disability cannot be classified as an "accidental bodily injury." Paul Revere also argues that CTS cannot be classified as an "accidental bodily injury" because CTS is not an unforeseen consequence of the repetitive hand movements required by court reporting.

Paul Revere's arguments, however, fail to address the New Jersey Supreme Court's test for interpreting insurance policy language. It is not necessary to determine whether CTS is an "injury" or "sickness" because the New Jersey Supreme Court does not require that a lay policyholder understand the distinction. The two physician letters supplied by Mastroianni and Paul Revere assert completely opposite opinions—Mastroianni's doctor states that CTS is caused by an injury, and Paul Revere's expert states that CTS is a disease process analogous to a sickness. An insured should not be subjected to "technical encumbrances," and to hold

Mastroianni responsible for knowing whether her CTS is an injury or sickness would require her to make a distinction that even the experts in the case dispute.

Thus, to determine whether CTS is an "injury" or "sickness" under the Policy, Mastroianni's reasonable expectations must be considered. As discussed above, Mastroianni believed that her disability was due to an accidental injury, and based on that belief, it was reasonable for Mastoianni to expect to receive benefits under the "accidental bodily injury" provision of the Policy. Interpretations of verb tenses and medical and law dictionary definitions of policy language provide no guidance because they do not represent Mastroianni's understanding of the Policy.

Further, to assert that Mastroianni's disability was not accidental because CTS is not an unforeseen consequence of court reporting would be to deem every injury sustained by voluntary activity not accidental. Under this theory, a broken leg sustained by a skier while skiing is not an accidental injury because breaking a leg is not an unforeseen consequence of skiing. An accidental injury is not required to be outside the realm of any contemplated possibility.

Unforeseen to Mastroianni, in the summer of 1997 she began experiencing pain and numbness in her elbows and fingers while working. She was informed that the repetitive movements required by court reporting resulted in CTS, and she understood from her doctors that her CTS was a result of injury. Mastroianni was unable to work as a court reporter due to her CTS, and filed for total disability benefits. Because she believed that her CTS was the result of injury, and she considered herself "injured," not "sick" or inflicted with a disease, Mastroianni reasonably expected to receive benefits under the "accidental bodily injury" provision of her insurance policy. Thus, Mastroianni should be paid benefits under the "accidental bodily injury" provision of the Policy.

### *CONCLUSION*

For the reasons expressed above, Plaintiff's motion for summary judgment will be granted and Defendant's cross-motion for summary judgment will be denied.

An appropriate Order will be entered.

### ORDER

For the reasons set forth in the Court's Opinion filed even date,

IT IS ORDERED on this _____ day of October, 2003 that Plaintiff's motion for summary judgment [24] is *GRANTED*.

IT IS FURTHER ORDERED that Defendant's cross-motion for summary judgment [27] is *DENIED*.